# POLK COUNTY ET AL. *v.* DODSON

No. 80–824.   Argued October 13, 1981—Decided December 14, 1981

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 327. BLACKMUN, J., filed a dissenting opinion, *post*, p. 328.

*Norman G. Jesse* argued the cause for petitioners. With him on the briefs was *Dan L. Johnston.*

*John D. Hudson,* by appointment of the Court, 450 U. S. 992, argued the cause and filed a brief for respondent.

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Acting Solicitor General Wallace, Acting Assistant Attorney General Turner, Elinor Hadley Stillman, Walter W. Barnett,* and *Louise A. Lerner.**

*Briefs of *amici curiae* were filed by *C. Paul Jones* and *Mollie G. Raskind* for the Minnesota State Public Defender; and by *Richard J. Wilson* and *Howard B. Eisenberg* for the National Legal Aid and Defender Association et al.

JUSTICE POWELL delivered the opinion of the Court.

The question in this case is whether a public defender acts "under color of state law" when representing an indigent defendant in a state criminal proceeding.

I

This case arose when the respondent Russell Richard Dodson filed a *pro se* complaint in the United States District Court for the Southern District of Iowa. Dodson brought the action in federal court under 42 U. S. C. § 1983. As the factual basis for his lawsuit Dodson alleged that Martha Shepard, an attorney in the Polk County Offender Advocate's Office, had failed to represent him adequately in an appeal to the Iowa Supreme Court.[1]

A full-time employee of the county, Shepard had been assigned to represent Dodson in the appeal of a conviction for robbery. After inquiring into the case, however, she moved for permission to withdraw as counsel on the ground that Dodson's claims were wholly frivolous.[2] Shepard accompanied her motion with an affidavit explaining this conclusion.

---

[1] According to findings made in the District Court: "[T]he Offender Advocate is the independent creation of the Polk County Board of Supervisors. It or one of its lawyers is appointed by the court to represent indigent defendants. It has a salaried lawyer director and several full time salaried lawyers. It is fully funded by Polk County." 483 F. Supp. 347, 349, n. 2 (1979). The office handles about 2,500 cases per year.

[2] She did so pursuant to Rule 104 of the Iowa Rules of Appellate Procedure, which provides in pertinent part:

"(a) If counsel appointed to represent a convicted indigent defendant in an appeal to the supreme court is convinced after conscientious investigation of the trial transcript that the appeal is frivolous and that he cannot, in good conscience, proceed with the appeal, he may move the supreme court in writing to withdraw. The motion must be accompanied by a brief referring to anything in the record that might arguably support the appeal."

Rule 104 also provides that prior to filing any motion to withdraw, the lawyer must advise his client in writing of his intention to do so. The cli-

She also filed a memorandum summarizing Dodson's claims and the supporting legal arguments. On November 9, 1979, the Iowa Supreme Court granted the motion to withdraw and dismissed Dodson's appeal.

In his complaint in the District Court the respondent alleged that Shepard's actions, especially her motion to withdraw, had deprived him of his right to counsel, subjected him to cruel and unusual punishment, and denied him due process of law.[3] He sought injunctive relief as well as damages in the amount of $175,000. To establish that Shepard acted "under color of state law," a jurisdictional requisite for a § 1983 action, Dodson relied on her employment by the county. Dodson also sued Polk County, the Polk County Offender Advocate, and the Polk County Board of Supervisors. He alleged that the Offender Advocate and the Board of Supervisors had established the rules and procedures that Shepard was bound to follow in handling criminal appeals.

The District Court dismissed Dodson's claims against all defendants. 483 F. Supp. 347 (1979). It held that the relevant actions by Shepard had not occurred under color of state law. Canvassing the leading authorities, it reasoned that a public defender owes a duty of undivided loyalty to his client. A public defender therefore could not be sued as an agent of the State. The District Court dismissed the Offender Advocate from the suit on the same theory. It also held

---

ent then has 30 days in which to notify the Supreme Court if he still wishes to proceed with the appeal. If the client does not communicate with the Supreme Court, the motion will be granted and the appeal dismissed. If the client does express a desire to proceed, the Supreme Court will review the legal points raised. If the court finds them not to be frivolous, "it may grant counsel's motion to withdraw but will prior to submission of the appeal afford the indigent the assistance of new counsel, to be appointed by the trial court." Iowa Rule App. Proc. 104(f).

The Iowa procedure is very similar to that prescribed by this Court in *Anders* v. *California*, 386 U. S. 738 (1967).

[3] Dodson also asserted pendent claims for malpractice and breach of an oral promise to prosecute the appeal.

that Dodson's complaint failed to allege the requisite personal involvement to state a § 1983 claim against Polk County and the Board of Supervisors.

The Court of Appeals for the Eighth Circuit reversed. 628 F. 2d 1104 (1980). Like the District Court, it assumed that a public defender owed his client the same responsibility as any other attorney. In its view, however, the "dispositive point" was that Iowa Offender Advocates were "employees of the County," which was "merely a creature of the State." Whether public defenders received instructions from county officials was "beside the point." "Public defenders receive their power not because they are selected by their clients, but because they are employed by the County to represent a certain class of clients, who likely have little or no choice in selecting the lawyer who will defend them." *Id.*, at 1106. In holding as it did on this issue, the court recognized that its decision conflicted with the holdings of a number of other Courts of Appeals. Reasoning that Dodson's *pro se* complaint should be liberally construed, the court also ordered reinstatement of the § 1983 claims against the Offender Advocate and the Board of Supervisors. The question of their involvement was left for factual development in the District Court. In addition, the court ordered that Dodson be given an opportunity on remand to state his claim against the county with greater specificity. Finally, the court rejected the argument that a public defender should enjoy the same immunity provided to judges and prosecutors. It held that the defendants were entitled to a defense of "good faith," but not of "absolute," immunity.

One member of the panel filed a dissent. The dissent argued that a person acts under color of state law only when exercising powers created by the authority of the State. In this case, it reasoned, the alleged wrongs were not made possible only because the defendant was a public defender. In

essence the complaint asserted an ordinary malpractice claim, which would be equally maintainable against a retained attorney or appointed counsel. The dissent also argued that public defenders should be entitled to absolute immunity from suit.

We granted certiorari to resolve the division among the Courts of Appeals over whether a public defender acts under color of state law when providing representation to an indigent client.[4] 450 U. S. 963 (1981). We now reverse.

## II

In *United States* v. *Classic*, 313 U. S. 299, 326 (1941), this Court held that a person acts under color of state law only when exercising power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the

---

[4] The Courts of Appeals for the Seventh and Eighth Circuits have held that public defenders do act under color of state law in their representation of indigent defendants. See *Robinson* v. *Bergstrom*, 579 F. 2d 401, 405–408 (CA7 1978) (public defender acts under color of state law but is absolutely immune from suit under § 1983); 628 F. 2d 1104 (1980) (case below). The Fifth and the Tenth Circuits have held that they do not. See *Slavin* v. *Curry*, 574 F. 2d 1256, 1265 (CA5), modified on other grounds, 583 F. 2d 779 (1978); *Espinoza* v. *Rogers*, 470 F. 2d 1174, 1175 (CA10 1972). The Third and Ninth Circuits have supported the latter position in dicta, in cases in which they have held that public defenders are entitled to absolute immunity from suit under § 1983. See *Brown* v. *Joseph*, 463 F. 2d 1046, 1048 (CA3 1972), cert. denied, 412 U. S. 950 (1973); *Miller* v. *Barilla*, 549 F. 2d 648, 650 (CA9 1977).

The petition for certiorari in this case also presented an immunity question. The petitioners asked us to decide whether public defenders are entitled to the same absolute immunity as judges, see *Bradley* v. *Fisher*, 13 Wall. 335 (1872), and prosecutors, see *Imbler* v. *Pachtman*, 424 U. S. 409 (1976). As we hold that a public defender does not act under color of state law when performing the traditional functions of counsel to a criminal defendant, we need not reach the immunity issue.

authority of state law."[5]  In this case the Offender Advocate for Polk County assigned Martha Shepard to represent Russell Dodson in the appeal of his criminal conviction.  This assignment entailed functions and obligations in no way dependent on state authority.  From the moment of her appointment, Shepard became Dodson's lawyer, and Dodson became Shepard's client.  Except for the source of payment, their relationship became identical to that existing between any other lawyer and client.  "Once a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender program." ABA Standards for Criminal Justice 4–3.9 (2d ed. 1980).[6]

Within the context of our legal system, the duties of a defense lawyer are those of a personal counselor and advocate. It is often said that lawyers are "officers of the court."  But the Courts of Appeals are agreed that a lawyer representing a client is not, by virtue of being an officer of the court, a state actor "under color of state law" within the meaning of § 1983.[7]  In our system a defense lawyer characteristically opposes the designated representatives of the State.  The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness.  But it posits that a defense lawyer best serves the public, not by acting on behalf of the State or in concert with it, but rather by advanc-

---

[5] The Court has reiterated this definition in subsequent cases.  See, e. g., Screws v. United States, 325 U. S. 91 (1945); Monroe v. Pape, 365 U. S. 167 (1961).

[6] See Burger, Counsel for the Prosecution and Defense—Their Roles Under the Minimum Standards, 8 Am. Crim. L. Q. 2, 6 (1969).  This view of the public defender's obligations to his client has been accepted by virtually every court that has considered the issue.  See, e. g., Espinoza v. Rogers, supra, at 1175; Brown v. Joseph, supra, at 1048.

[7] See, e. g., Skolnick v. Martin, 317 F. 2d 855 (CA7 1963); Dotlich v. Kane, 497 F. 2d 390 (CA8 1974).  This is true even of cases in which a private attorney has been assigned to represent an indigent defendant. See, e. g., Page v. Sharpe, 487 F. 2d 567, 570 (CA1 1973); Hall v. Quillen, 631 F. 2d 1154, 1156 (CA4 1980); Mulligan v. Schlachter, 389 F. 2d 231,

ing "the undivided interests of his client."[8]   This is essentially a private function, traditionally filled by retained counsel, for which state office and authority are not needed.[9]

## III

The respondent argues that a public defender's employment relationship with the State, rather than his function, should determine whether he acts under color of state law. We take a different view.

### A

In arguing that the employment relationship establishes that the public defender acts under color of state law, Dodson relies heavily on two cases in which this Court assumed that physicians, whose relationships with their patients have not traditionally depended on state authority, could be held liable under § 1983.   See *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975); *Estelle* v. *Gamble*, 429 U. S. 97 (1976).   These cases, he argues, are analytically identical to this one.   Like the physicians in *O'Connor* and *Estelle*, a public defender is paid by the State.   Further, like the institutionalized patients in

233 (CA6 1968); *French* v. *Corrigan*, 432 F. 2d 1211, 1214 (CA7 1970), cert. denied, 401 U. S. 915 (1971); *Barnes* v. *Dorsey*, 480 F. 2d 1057, 1061 (CA8 1973).

[8] *Ferri* v. *Ackerman*, 444 U. S. 193, 204 (1979):
"[T]he primary office performed by appointed counsel parallels the office of privately retained counsel.   Although it is true that appointed counsel serves pursuant to statutory authorization and in furtherance of the federal interest in insuring effective representation of criminal defendants, his duty is not to the public at large, except in that general way.   His principal responsibility is to serve the undivided interests of his client.   Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation."

[9] Although lawyers are generally licensed by the States, "they are not officials of government by virtue of being lawyers." *In re Griffiths*, 413 U. S. 717, 729 (1973).

those cases, an indigent convict is unable to choose the professional who will render him traditionally private services. These factors, it is argued, establish that public defenders—like physicians in state hospitals—act under color of state law and are amenable to suit under § 1983.

In our view *O'Connor* and *Estelle* are distinguishable from this case. *O'Connor* involved claims against a psychiatrist who served as the superintendent at a state mental hospital. Although a physician with traditionally private obligations to his patients, he was sued in his capacity as a state custodian and administrator. Unlike a lawyer, the administrator of a state hospital owes no duty of "undivided loyalty" to his patients. On the contrary, it is his function to protect the interest of the public as well as that of his wards. Similarly, *Estelle* involved a physician who was the medical director of the Texas Department of Corrections and also the chief medical officer of a prison hospital. He saw his patients in a custodial as well as a medical capacity.

Because of their custodial and supervisory functions, the state-employed doctors in *O'Connor* and *Estelle* faced their employer in a very different posture than does a public defender. Institutional physicians assume an obligation to the mission that the State, through the institution, attempts to achieve. With the public defender it is different. As argued in the dissenting opinion in the Court of Appeals, it is the function of the public defender to enter "not guilty" pleas, move to suppress State's evidence, object to evidence at trial, cross-examine State's witnesses, and make closing arguments in behalf of defendants.[10] All of these are adversarial functions. We find it peculiarly difficult to detect any color of state law in such activities.

B

Despite the public defender's obligation to represent his clients against the State, Dodson argues—and the Court of Appeals concluded—that the status of the public defender

---

[10] See 628 F. 2d, at 1110.

differs materially from that of other defense lawyers. Because public defenders are paid by the State, it is argued that they are subject to supervision by persons with interests unrelated to those of indigent clients. Although the employment relationship is certainly a relevant factor, we find it insufficient to establish that a public defender acts under color of state law within the meaning of § 1983.

First, a public defender is not amenable to administrative direction in the same sense as other employees of the State. Administrative and legislative decisions undoubtedly influence the way a public defender does his work. State decisions may determine the quality of his law library or the size of his caseload. But a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior. Held to the same standards of competence and integrity as a private lawyer, see *Moore* v. *United States*, 432 F. 2d 730 (CA3 1970), a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client. "A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services." DR 5–107 (B), ABA Code of Professional Responsibility (1976).[11]

Second, and equally important, it is the constitutional obligation of the State to respect the professional independence

---

[11] This rule has been adopted verbatim as DR 5–107 (B), Iowa Code of Professional Responsibility for Lawyers, printed in Iowa Rules of Court 526 (1981). The rule is "mandatory in character," and a lawyer who violated it would be "subject to disciplinary action" by the Iowa courts. *Id.*, at 477. See *Sanchez* v. *Murphy*, 385 F. Supp. 1362, 1365 (Nev. 1974) ("The personal attorney-client relationship established between a deputy [public defender] and a defendant is not one that the public defender can control. The canons of professional ethics require that the deputy be 'his own man' irrespective of advice or pressures from others. A deputy public defender cannot in any realistic sense, in fulfillment of his professional responsibilities, be a servant of the public defender. He is, himself an independent officer").

of the public defenders whom it engages.[12]   This Court's decision in *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), established the right of state criminal defendants to the "'guiding hand of counsel at every step in the proceedings against [them].'" *Id.,* at 345, quoting *Powell* v. *Alabama,* 287 U. S. 45, 69 (1932).   Implicit in the concept of a "guiding hand" is the assumption that counsel will be free of state control. There can be no fair trial unless the accused receives the services of an effective and independent advocate.   See, *e. g., Gideon* v. *Wainwright, supra; Holloway* v. *Arkansas,* 435 U. S. 475 (1978).   At least in the absence of pleading and proof to the contrary, we therefore cannot assume that Polk County, having employed public defenders to satisfy the State's obligations under *Gideon* v. *Wainwright,* has attempted to control their action in a manner inconsistent with the principles on which *Gideon* rests.[13]

## C

The respondent urges a different view of the public defender's relationships to his clients and to the State.   Whatever

---

[12] Relying on such cases as *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961), and *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163 (1972), the respondent claims that the State's funding of criminal defenses makes it a "joint participant" in that enterprise, locked in a "symbiotic relationship" with individual public defenders.   He urges us to hold on this theory that public defenders act under color of state law within the meaning of § 1983.   We cannot do so.   In both *Burton* and *Moose Lodge* the question was whether "state action" was present.   In this case the question is whether a public defender—who is concededly an employee of the county—acted "under color of state law" in her representation of Russell Dodson.   Although this Court has sometimes treated the questions as if they were identical, see *United States* v. *Price,* 383 U. S. 787, 794, and n. 7 (1966), we need not consider their relationship in order to decide this case. Our factual inquiry into the professional obligations and functions of a public defender persuades us that Shepard was not a "joint participant" with the State and that, when representing respondent, she was not acting under color of state law.

[13] The dissenting opinion, *post,* at 328, describes the public defender as "a full-time state employee, working in an office fully funded and extensively

their ethical obligations, public defenders do not, he argues, characteristically extend their clients the same undivided loyalty tendered by privately retained attorneys. In support of this argument Dodson notes that the public defender moved to be dismissed from his case against the client's wishes. Dodson claims to have suffered prejudice from this act. He insists that such action would not have been taken by a privately retained attorney.

Dodson's argument assumes that a private lawyer would have borne no professional obligation to refuse to prosecute a frivolous appeal. This is error. In claiming that a public defender is peculiarly subject to divided loyalties, Dodson confuses a lawyer's ethical obligations to the judicial system with an allegiance to the adversary interests of the State in a criminal prosecution. Although a defense attorney has a duty to advance all colorable claims and defenses, the canons of professional ethics impose limits on permissible advocacy. It is the obligation of any lawyer—whether privately retained or publicly appointed—not to clog the courts with frivolous motions or appeals.[14] Dodson has no legitimate complaint that his lawyer refused to do so.

---

regulated by the State and acting to fulfill a state obligation." The dissent reasons from this description that, for purposes of determining the "under color of state law" question, the function performed by the public defender is immaterial. There is no difference in this respect, the dissent contends, between administrative functions, see *Branti* v. *Finkel*, 445 U. S. 507 (1980), and a lawyer's traditional functions as counsel to a defendant in a criminal proceeding. This view ignores the basic distinction that in the latter capacity a public defender is not acting on behalf of the State; he is the State's adversary.

[14] See ABA Standards for Criminal Justice, Commentary to 4–3.9 (2d ed. 1980) ("No lawyer, whether assigned by the court, part of a legal aid or defender staff, or privately retained or paid, has any duty to take any steps or present dilatory or frivolous motions or any actions that are unfounded according to the lawyer's informed professional judgment. On the contrary, to do so is unprofessional conduct"); ABA Standing Committee on Ethics and Professional Responsibility, Informal Opinion 955, Obligation to Take Criminal Appeal, reprinted in 2 Informal Ethics Opinions 955–956

As a matter of empirical fact, it may or may not be true that the professional obligation to withdraw from frivolous appeals will be invoked with disproportionate frequency in cases involving indigent prisoners. The recent burgeoning of postconviction remedies has undoubtedly subjected the legal system to unprecedented strains, including increased demands for legal assistance.[15] The State of Iowa has responded by authorizing the provision of greater representation than the Constitution requires. Its system of public defenders contemplates the extension of legal assistance through the various tiers of postconviction review, incorporating only the general ethical limitation that counsel should withdraw from frivolous cases.[16]

In this context Dodson argues that public defenders making withdrawal decisions are viewed by indigent prisoners as hostile state actors. We think there is little justification for this view, if indeed it is widely held.[17]

## IV

In concluding that Shepard did not act under color of state law in exercising her independent professional judgment in a criminal proceeding, we do not suggest that a public defender

(1975) (like court-appointed lawyer, private counsel "ethically, should not clog the courts with frivolous motions or appeals"). See also *Nickols* v. *Gagnon*, 454 F. 2d 467, 472 (CA7 1971).

[15] See ABA Standards for Criminal Justice, Commentary to 4–3.9 (2d ed. 1980) (noting that lawyers assigned to indigent prisoners are often put under pressure to "engage in dilatory or frivolous tactics").

[16] See Iowa Code, Ch. 336A (1981). A public defender appointed pursuant to the state statute is directed to "prosecute any appeals or other remedies before or after conviction that he considers to be in the interest of justice." § 336A.6.

[17] The view is unfortunate. Our adversary system functions best when a lawyer enjoys the wholehearted confidence of his client. But confidence will not be improved by creating a disincentive for the States to provide postconviction assistance to indigent prisoners. To impose § 1983 liability for a lawyer's performance of traditional functions as counsel to a criminal defendant would have precisely that effect.

never acts in that role. In *Branti* v. *Finkel*, 445 U. S. 507 (1980), for example, we found that a public defender so acted when making hiring and firing decisions on behalf of the State. It may be—although the question is not present in this case—that a public defender also would act under color of state law while performing certain administrative and possibly investigative functions. Cf. *Imbler* v. *Pachtman*, 424 U. S. 409, 430–431, and n. 33 (1976). And of course we intimate no views as to a public defender's liability for malpractice in an appropriate case under state tort law. See *Ferri* v. *Ackerman*, 444 U. S. 193, 198 (1979).[18] With respect to Dodson's § 1983 claims against Shepard, we decide only that a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding.[19] Because it was based on such activities, the complaint against Shepard must be dismissed.

## V

In his complaint in the District Court, Dodson also asserted § 1983 claims against the Offender Advocate, Polk County, and the Polk County Board of Supervisors. Section 1983 will not support a claim based on a *respondeat superior* theory of liability. *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 694 (1978). To the extent that Dodson's claims rest on this basis, they fail to present a federal claim.

---

[18] In addition to possible relief under state tort law, an indigent prisoner retains the right to initiate state and federal habeas corpus proceedings. For an innocent prisoner wrongly incarcerated as the result of ineffective or malicious counsel, this normally is the most important form of judicial relief.

[19] We do not disturb the theory of cases, brought under 18 U. S. C. § 242, in which public defenders have been prosecuted for extorting payment from clients' friends or relatives "under color of . . . law . . . ." See, *e. g.*, *United States* v. *Senak*, 477 F. 2d 304 (CA7), cert. denied, 414 U. S. 856 (1973).

The Court of Appeals apparently read Dodson's *pro se* complaint as susceptible of another construction. It found an actionable claim in the bald allegation that Shepard had injured him while acting pursuant to administrative "rules and procedures for . . . handling criminal appeals" and that her employers were therefore responsible for her actions. 628 F. 2d, at 1108. We also have noted an allegation in respondent's complaint that the county "retains and maintains, advocates out of law school" who have on numerous occasions moved to withdraw from appeals of criminal convictions.

The question is whether either allegation describes a constitutional tort actionable under § 1983. We conclude not. In *Monell* v. *New York City Dept. of Social Services, supra,* we held that official policy must be "the moving force of the constitutional violation" in order to establish the liability of a government body under § 1983. *Id.,* at 694. See *Rizzo* v. *Goode,* 423 U. S. 362, 370–377 (1976) (general allegation of administrative negligence fails to state a constitutional claim cognizable under § 1983). In this case the respondent failed to allege any policy that arguably violated his rights under the Sixth, Eighth, or Fourteenth Amendments. He did assert that assistant public defenders refused to prosecute certain appeals on grounds of their frivolity. But a policy of withdrawal from frivolous cases would not violate the Constitution. *Anders* v. *California,* 386 U. S. 738 (1967). And respondent argued the existence of no impermissible policy pursuant to which the withdrawals might have occurred. Respondent further asserted that he personally was deprived of a Sixth Amendment right to effective counsel. Again, however, he failed to allege that this deprivation was caused by any constitutionally forbidden rule or procedure.

When Dodson's complaint is viewed against the standards of our cases, even in light of the sympathetic pleading requirements applicable to *pro se* petitioners, see *Haines* v. *Kerner,* 404 U. S. 519 (1972) *(per curiam),* we do not believe

he has alleged unconstitutional action by the Offender Advocate, Polk County, or the Polk County Board of Supervisors. Accordingly, his claims against them must be dismissed.

## VI

For the reasons stated in this opinion, the decision of the Court of Appeals is

*Reversed.*

CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion, but it is important to emphasize that in providing counsel for an accused the governmental participation is very limited. Under *Gideon* v. *Wainwright*, 372 U. S. 335 (1963), and *Argersinger* v. *Hamlin*, 407 U. S. 25 (1972), the government undertakes only to provide a professionally qualified advocate wholly independent of the government. It is the independence from governmental control as to how the assigned task is to be performed that is crucial. The advocate, as an officer of the court which issued the commission to practice, owes an obligation to the court to repudiate any external effort to direct how the obligations to the client are to be carried out. The obligations owed by the attorney to the client are defined by the professional codes, not by the governmental entity from which the defense advocate's compensation is derived. Disciplinary Rule 5–107 (B) of the ABA Code of Professional Responsibility* succinctly states the rule:

---

*See, *e. g.*, ABA Code Of Professional Responsibility, Canon 5 (1976): "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Ethical Consideration 5–1 explains this Canon:

"The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client."

See also ABA Standards for Criminal Justice, The Prosecution Function, Ch. 3, The Defense Function, Ch. 4 (2d ed. 1980).

"(B) A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services."

Moreover, it is elementary that every advocate has an obligation to eschew proceedings considered to be professionally improper or irresponsible. Once counsel in this case reached a considered judgment on the merits of the claim sought to be put forward, her actions were consistent with the highest traditions of the Bar.

JUSTICE BLACKMUN, dissenting.

One perhaps should be particularly circumspect when he finds himself in solitary dissent. See *Commissioner* v. *"Americans United" Inc.*, 416 U. S. 752, 763 (1974) (dissenting opinion). On careful reflection, however, I am convinced that my position is a valid one, and I therefore set forth my views in opposition to those of the Court.

---

When a full-time state employee, working in an office fully funded and extensively regulated by the State and acting to fulfill a state obligation, violates a person's constitutional rights, the Court consistently has held that the employee acts "under color of" state law, within the meaning and reach of 42 U. S. C. § 1983. Because I conclude that the Court's decision in this case is contrary to its prior rulings on the meaning of "under color of" state law, and because the Court charts new territory by adopting a functional test in determining liability under the statute, I respectfully dissent.

I

The Court holds for the first time today that a government official's "employment relationship" is no more than a "relevant factor" in determining whether he acts under color of state law within the meaning of § 1983. *Ante*, at 321. Only

last Term, in *Parratt* v. *Taylor*, 451 U. S. 527 (1981), the Court noted that defendant-prison officials unquestionably satisfied the under-color-of-state-law requirement because they "were, after all, state employees in positions of considerable authority." *Id.*, at 535–536. Thus began, and ended, the Court's discussion of the color-of-law question in that case. As in *Taylor*, the county employee sued in this action presumptively acts under color of state law. See also *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 157, n. 5 (1978).

The definition of "under color of" state law relied upon by the Court here and articulated in *United States* v. *Classic*, 313 U. S. 299 (1941), requires that the defendants in a § 1983 action have committed the challenged acts "in the course of their performance of duties" and have misused power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law . . . ." *Id.*, at 325–326. See also *Screws* v. *United States*, 325 U. S. 91, 110 (1945) (plurality opinion).

Respondent's allegations place this case squarely within both components of that definition. Respondent challenges action taken by petitioner Shepard, a full-time county employee, while acting in her official capacity and while exercising her responsibilities pursuant to Iowa law. See generally Iowa Code §§ 336A.3.2, 336A.6 (1981). The Court implicitly concedes that the Offender Advocate's assignment of Shepard to handle respondent's appeal was action under color of law. But the Court then fails to recognize that it was by virtue of that assignment that Shepard had the authority to represent respondent and to seek permission to withdraw as his counsel, thereby allegedly violating his constitutional rights. The authority of a privately retained attorney to represent his clients is derived from the client's selection of the lawyer. A public defender's power, however, is possessed by virtue of the State's selection of the attorney and his official employment.

The Court insists that public defenders, unlike other state employees, are free from state control because they are not subject to administrative direction—both because ethical standards require that their professional judgment not be sacrificed to the interests of their employers and because the State is obligated to provide indigent defendants with independent advocates.[1] This distinction ignores both precedent and reality. The Court long has held that a state official acts under color of law when the State does not authorize, or even know of, his conduct. See, *e. g., Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 152 (1970); *Monroe* v. *Pape*, 365 U. S. 167 (1961). That the State did not instruct Shepard to withdraw from respondent's case is therefore irrelevant to the question whether she acted under color of state law in so doing.

Moreover, the present case is indistinguishable from *Estelle* v. *Gamble,* 429 U. S. 97 (1976). There the Court held that a prison doctor's deliberate indifference to a prisoner's medical needs is prohibited by the Eighth Amendment and may be the subject of a § 1983 claim. The prisoner's § 1983

---

[1] The Court also says that a public defender's ethical duties and obligations are the same as those of a privately retained lawyer and concludes that the public defender serves "essentially a private function . . . for which state office and authority are not needed." *Ante,* at 319. The fact that a state official's role is parallel to one in the private sector, however, has never before deterred the Court from holding that the former is action under color of state law. Section 1983 is meant to proscribe certain actions by state officials even though identical conduct by private persons is not included within the statute's scope. Cf. *Estelle* v. *Gamble,* 429 U. S. 97 (1976); see also *Griffin* v. *Maryland,* 378 U. S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity . . ."). Although *Griffin* involved "state action" under the Fourteenth Amendment, "state action" and "under color of state law" have consistently been treated as incorporating identical requirements. See n. 5, *infra.*

complaint in *Gamble* stated claims against Dr. Gray in his capacity both as medical director for the Texas Department of Corrections *and* as treating physician. Gray was sued because he allegedly had given the plaintiff substandard medical care—the doctor's duty to the public and his custodial and supervisory functions were not at issue.[2] If the Court had determined that Gray acted under color of state law only in his capacity as a custodian and administrator, it would have dismissed the claims against him for want of subject-matter jurisdiction, rather than on the merits.

The Court today holds that a public defender cannot act under color of state law because of his independent ethical obligations to his client. Yet *Gamble* cannot be distinguished on this ground. An individual physician has a professional and ethical obligation to his patient just as an attorney has to his client. Like a public defender, an institutional doctor's responsibilities to a patient may conflict with institutional policies and practices. Moreover, Dr. Gray was fulfilling the State's duty to supply medical care to prison inmates; similarly, the public defender is dedicated to satisfying the State's obligation to provide representation to indigent defendants. Finally, like respondent, who had no say in the selection of Shepard as his attorney, inmate Gamble had no role in the choice of Gray as his doctor. The *Gamble* Court did not find that color of state law evaporated in the face of a professional's independent ethical obligations. I cannot see why this case is different.

As is demonstrated by the pervasive involvement of the county in the operations of the Offender Advocate's Office,

---

[2] Similarly, in *O'Connor* v. *Donaldson*, 422 U. S. 563 (1975), the defendant, a psychiatrist and superintendent of a state mental hospital, was not sued for actions taken pursuant to his responsibilities to protect the public; the evidence clearly showed that the plaintiff was hospitalized for reasons other than dangerousness to himself and others. See *id.*, at 567–568, 574, n. 9.

the Court, in my view, unduly minimizes the influence that the government actually has over the public defender. The public defender is not merely paid by the county; he is totally dependent financially on the County Board of Supervisors, which fixes the compensation for the public defender and his staff and provides the office with equipment and supplies. See Iowa Code §§ 336A.5, 336A.9 (1981).

The Board likewise is statutorily empowered to determine "indigency" and to prescribe the number of assistant attorneys and other staff members considered necessary for the public defender. See §§ 336A.4, 336A.5. The county's control over the size of and funding for the public defender's office, as well as over the number of potential clients, effectively dictates the size of an individual attorney's caseload and influences substantially the amount of time the attorney is able to devote to each case. The public defender's discretion in handling individual cases—and therefore his ability to provide effective assistance to his clients—is circumscribed to an extent not experienced by privately retained attorneys. See, *e. g., Robinson* v. *Bergstrom,* 579 F. 2d 401, 402–403 (CA7 1978) (public defender delayed five and one-half years in filing appellate brief because of "an error in his judgment regarding his caseload," which was 600 to 900 cases per year). Similarly, authority over the appointment of the public defender and his staff, see Iowa Code §§ 336A.3, 336A.5 (1981), gives the State substantial influence over the quality of the representation indigents receive.

In addition, the public defender is directed to file an annual report with the judges of the district court of any county he serves, the State's Attorney General, and each county's Board of Supervisors, setting forth in detail all cases handled by the defender's office during the preceding year. § 336A.8. This requirement suggests that the government has some supervisory control over the public defender's office, or at least that the public defender will be wary of antagonizing the officials to whom he must report, and to

whom he owes his appointment and the very existence of the
office.  See §§ 336A.3, 336A.1.  And surely the public de-
fender's staff must conform to whatever policies and regula-
tions the office or the State imposes, including those aimed at
ensuring the effectiveness of representation.  In this case,
for example, while the county may not have directed peti-
tioner Shepard to withdraw from respondent's case,[3] it cer-
tainly could have established general guidelines describing
the factors a public defender should consider in determining
which appeals are frivolous and the proper treatment of such
appeals.[4]

On the basis of the Court's opinion in *Estelle* v. *Gamble*,
429 U. S. 97 (1976), and the county's pervasive involvement
with the Offender Advocate's Office in this case, I necessarily
conclude that the presumption that a state employee acts

---

[3] Reasoning that § 1983 claims may not be based on the doctrine of
*respondeat superior*, the Court concludes that respondent has not stated a
claim against the Offender Advocate, Polk County, or the County Board of
Supervisors.  See *ante*, at 325–327.  I agree with the Court of Appeals,
however, that respondent did allege that these defendants had "established
and layed *[sic]* out the ground rules" for the public defender's office and
had "authorize[d] [petitioner Shepard] to act in the manner prescribed in
[the] complaint. . . ." App. 5.  Respondent also alleged that other public
defenders in the Offender Advocate's Office had acted in the same manner
as had Shepard, and he challenged the "process" by which the office repre-
sented indigents.  *Id.*, at 13.  Although respondent did not point to any
particular official policy pursuant to which Shepard had acted in withdraw-
ing from his case, his general allegations of the existence of such a policy,
"however inartfully pleaded, are sufficient to call for the opportunity to of-
fer supporting evidence."  *Haines* v. *Kerner*, 404 U. S. 519, 520 (1972).
If respondent is unable to substantiate his claims, the complaint, of course,
may be dismissed on a motion for summary judgment.

[4] This pervasive state control over public defenders distinguishes them
from court-appointed attorneys, who are not state officials, who have
control over their own caseloads and representations, who depend on the
State only for a fee, and with whom the State has no real day-to-day
involvement.

under color of state law when exercising his official duties is not overridden by the public defender's ethical obligations to his client.[5]

## II

Although holding that petitioner Shepard may not be held liable under § 1983 for withdrawing from respondent's appeal, the Court limits its ruling to cases where the public defender performs "a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Ante*, at 325. The Court appears to concede that a public defender may act under color of state law when performing unspecified administrative and investigative functions, or even when acting as an advocate—if his conduct is "nontraditional," or if the plaintiff pleads and proves that the State influenced the attorney's representation. See *ante*, at 325, and n. 19, and 322. These attempts to draw distinctions based on function are unconvincing.

---

[5] Although I find the Court's precedents on the definition of "under color of" state law persuasive here, I also draw support from the Court's discussions of state action under the Fourteenth Amendment. I find no basis for the Court's intimation, *ante*, at 322, n. 12, that the two doctrines incorporate different requirements. See *United States* v. *Price*, 383 U. S. 787, 794, n. 7 (1966). To the extent that the Court has analyzed the two concepts separately, it has done so in § 1983 suits against private actors. In *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 157, n. 5 (1978), the Court observed: "Of course, where the defendant is a public official, the two elements of a § 1983 action merge. 'The involvement of a state official . . . plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment . . . rights, whether or not the actions of the [officer] were officially authorized, or lawful.' *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 152 (1970) (citations omitted)." (Ellipses in original.)

The principles articulated in *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961), for discerning state action in the conduct of a private party are therefore helpful by way of analogy. First, the public defender's office "constitute[s] a physically and financially integral and, indeed, indispensable part of the State's plan," *id.*, at 723–724, to fulfill its constitutional obligation to provide representation to indigents. Second, the relation-

The Court never before has held that a government employee acts under color of state law while performing some of his official duties but not while performing others. The Court drew no such distinctions in *Estelle* v. *Gamble, supra,* although it could have adopted the Court's approach today and held that an institutional physician acts under color of state law when acting in his custodial and administrative roles, but not when treating a patient. I can only conclude that the Court creates this artificial distinction in order to avoid a conflict with *Branti* v. *Finkel,* 445 U. S. 507 (1980), where the Court did not pause to question whether the defendant-public defender acted under color of state law.

*Imbler* v. *Pachtman,* 424 U. S. 409 (1976), cited by the Court, *ante,* at 325, does not support such line-drawing. Based on policy considerations that are inapplicable here, see n. 8, *infra,* the Court held in *Imbler* that the prosecutor enjoys absolute immunity for actions taken in his role as an advocate. The Court refused to decide, however, whether the same policies require immunity for prosecutors acting in their administrative or investigative roles. Not only did the *Imbler* Court therefore fail to endorse the functional test adopted here, but it pointed to the difficulties it foresaw in implementing such a test. See 424 U. S., at 431, n. 33.

---

ship between the State and the public defender is a symbiotic one: the State is able to satisfy its responsibility to supply counsel to defendants, and the public defender is gainfully employed. Finally, the State is responsible for the public defender's office and can attempt to ensure that clients receive effective assistance of counsel, for example, by hiring qualified personnel, providing sufficient funding, and enforcing strict standards of competence. In cases of ineffective assistance by public defenders, then, it may be said that the State "has not only made itself a party to the [representation], but has elected to place its power, property and prestige behind [the public defender's action]. The State has so far insinuated itself into a position of interdependence with [the attorney] that it must be recognized as a joint participant in the challenged activity . . . ." *Id.,* at 725.

Moreover, the question of immunity—what type of affirmative defense is to be afforded a state official sued under § 1983—is completely different from the issue whether an employee acts under color of state law—a determination that goes to a federal court's subject-matter jurisdiction over a complaint. If a defendant does not act under color of state law, a federal court has no power to entertain a § 1983 complaint against him. The immunity doctrine, which is based on common-law traditions and policy considerations, is a defense that must be pleaded and is not relevant to a court's power to consider the case. Even officials protected by absolute immunity act under color of state law, and *Imbler* did not indicate to the contrary; in fact, absolute immunity protects a prosecutor from § 1983 liability only as long as his actions are within the scope of the immunity. See *Imbler*, 424 U. S., at 419, n. 13. The Court nowhere suggested in *Imbler* that the functional test could properly be used in any other context.

The Court also disclaims any intent to disturb cases in which public defenders have been prosecuted under the criminal counterpart of § 1983, 18 U. S. C. § 242, for extorting payment from clients' friends or relatives, *ante*, at 325, n. 19, citing *United States* v. *Senak*, 477 F. 2d 304 (CA7), cert. denied, 414 U. S. 856 (1973), apparently because the Court does not consider such conduct a "traditional" function of an attorney.[6] Yet the Court of Appeals' holding in *Senak* that the attorney acted under color of law is inconsistent with the

[6] Again, the Court's hand is forced somewhat by precedent—even those officials afforded absolute immunity from civil damages under § 1983 are susceptible to prosecution under § 242 for the willful violation of civil rights. See *Imbler* v. *Pachtman*, 424 U. S. 409, 429 (1976). The Court has consistently held that the two provisions incorporate the same under-color-of-state-law requirement. See, *e. g.*, *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 152, n. 7 (1970); *United States* v. *Price*, 383 U. S., at 794, n. 7.

Court's line-drawing here.[7]   As the final loophole, the Court apparently leaves open the possibility that an indigent defendant could plead and prove that the State so influenced the public defender assigned to his case as to make the public defender liable under § 1983.   See *ante*, at 322.   What type of state intervention is sufficient, and how a plaintiff is supposed to allege such facts before discovery, are not specified.

In essence, the Court appears to be holding a public defender exempt from § 1983 liability only when the alleged injury is ineffective assistance of counsel.   Not only is it disturbing to see the Court adopt a hierarchy of constitutional rights for purposes of § 1983 actions, but such an approach will be extremely difficult to implement.   I envision the Court's functional analysis as having one of two results— both, in my view, unfortunate.   If the federal courts in effect adopt a *per se* rule and dismiss all § 1983 complaints against public defenders, the most egregious behavior by a public defender, even if unquestionably the result of pressures by the State, will not be cognizable under § 1983.   Alternatively, the courts may attempt diligently to implement the Court's ruling and dismiss only those § 1983 claims based on the public defender's "traditional" functions as an advocate.   The outcome then, I fear, will be lengthy and involved hearings on the merits to determine whether the court has subject-matter jurisdiction—the very result the Court wishes to avoid.

### III

I am sympathetic with the Court's desire to protect public defenders, who represent indigent defendants in good faith, from a § 1983 suit by every dissatisfied client.   But the Court's concern for public defender programs—and its seeming hostility to the merits of respondent's claims, see *ante*, at 323–324, and n. 17—do not justify the approach taken by the

---

[7] In *Senak* the Court of Appeals held that a public defender's demand for compensation from a client was made "ostensibly by virtue of [the attor-

Court today. To recognize that public defenders act under color of state law would not transform every legal malpractice into a constitutional violation. Cf. *Estelle* v. *Gamble*, 429 U. S., at 105–106. Presumably, some immunity would be provided public defenders sued under § 1983.[8] The Court always has seen fit before to rely on immunity and the procedures available for dismissing meritless complaints in order to protect state officials. See, *e. g.*, *Butz* v. *Economou*, 438 U. S. 478, 507–508 (1978); cf. *Ferri* v. *Ackerman*, 444 U. S. 193, 200, n. 17 (1979). I would do the same here.

I would affirm the judgment of the Court of Appeals.

---

ney's] appointment 'backed by the power of the state,'" and that his official position "gave him the opportunity to make the demands and clothed him with the authority of the state in so doing." 477 F. 2d, at 308. Similarly, in this case, petitioner Shepard's authority to withdraw from respondent's case was derived from her "appointment 'backed by the power of the state'"; her official position "gave her the opportunity" to act so as allegedly to violate respondent's constitutional rights.

[8] I do not discuss this issue in detail because the Court does not reach it, but I assume that public defenders should be afforded qualified immunity. Absolute immunity has been extended only to those in positions that have a common-law history of immunity. See, *e. g.*, *Pierson* v. *Ray*, 386 U. S. 547, 554–555 (1967). Moreover, public defenders' jobs do not subject them to conflicting responsibilities to a number of constituencies so that absolute immunity is necessary to ensure principled decisionmaking; in fact, the threat of § 1983 claims by dissatisfied clients may provide additional incentive for competent performance of a public defender's duties. See *Ferri* v. *Ackerman*, 444 U. S. 193, 203–204 (1979).