WHITE, ADMR., APPELLANT, *v.* MOODY, MAYOR, ET AL.; PANGALANGAN ET AL., APPELLEES.

(No. 84AP-615 — Decided June 20, 1985.)

*Arnold S. White, pro se.*

*Porter, Wright, Morris & Arthur, William M. Todd, James E. Pohlman* and *Roberta Y. Bavry,* for appellee Pangalangan.

*Crabbe, Brown, Jones, Potts & Schmidt, Gilbert J. Gradisar* and *William L. Schmidt,* for appellees Mary Nolze and Eleanor Roberts.

REILLY, P.J. This is the appeal of plaintiff, Arnold S. White, Administrator of the Estate of Noble Jackson, deceased, from the judgment of the trial court directing a verdict in favor of defendants, Dr. A. L. Pangalangan, El-eanor Roberts and Mary Nolze. Plaintiff advances four arguments, which will be treated as assignments of error, as follows:

"I. The defendants acted under color of state law.

"II. Defendants violated Noble Jackson's civil rights pursuant to 42 U.S.C. § 1983.

"III. Defendant Pangalangan did not act in accordance with the applicable standards of care in rendering medical care and treatment of Noble Jackson.

"IV. Whether the actions of defendants proximately caused the death of Noble Jackson and the actions of Nolze and Roberts caused her injury and suffering were questions of fact for the jury."

Plaintiff's decedent, Noble Jackson (hereinafter "Jackson"), was an inmate in pre-trial detention at the Columbus Women's Correctional Institute (hereinafter "WCI" or "workhouse") in May and June 1979. Defendant Pangalangan was a physician under contract with the city to provide medical services to the inmates at WCI, and who was present in the facility for "sick call" twice a week and on call at all other times. Defendants Nolze and Roberts were registered nurses employed at WCI, who conducted "pill calls" three times a day, and who were otherwise in charge of providing customary nursing care to the inmates at the workhouse.

Approximately one month prior to her incarceration, Jackson delivered a stillborn child. She evidently continued to have complications arising from this pregnancy, and was hospitalized on two occasions, once for hemorrhagic shock just ten days before her arrest. Jackson continued to have complications following her arrest, complaining to fellow inmates that she had headaches, vaginal pain and was spitting up blood.

Jackson made thirteen visits to pill call, each time receiving aspirin and one time receiving an antacid. She was ultimately scheduled to see Pangalangan on Friday, June 1, 1979; and, according to the doctor's testimony, she complained only of a yellow vaginal discharge. Pangalangan prescribed suppositories and scheduled Jackson into an outside clinic for the following week. Jackson also complained of being unable to climb to her upper bunk, and demanded a lower bunk. When Pangalangan asked what other medical conditions she had which necessitated a lower bunk, Jackson denied any other medical problems, and Pangalangan refused a lower bunk.

On the afternoon of June 1, 1979, Jackson fainted while in the recreation room at WCI. She was taken to an individual cell which was used for medical purposes, and was examined by Roberts. Jackson complained of paralysis of her left side; but, upon examining her, Roberts concluded that Jackson had movement in her extremities and was without distress. Jackson remained in the cell the rest of that day and the next two days, and was observed by the nurse or guards from time to time.

On Sunday evening, June 3, Jackson was observed to be in extreme distress and frothing at the mouth. She was taken to Mt. Carmel Hospital, where she died the next day. An autopsy revealed that the cause of death was cardiopulmonary arrest due to choriocarcinoma of the uterus with metastases to the lungs, spleen and brain.

Plaintiff subsequently sued defendants, along with other defendants who were dismissed prior to the trial. Plaintiff's complaint was based on medical malpractice and violation of Jackson's civil rights, in violation of Section 1983, Title 42, U.S. Code. Following the presentation of plaintiff's case, the trial court directed a verdict for all defendants on all claims, and plaintiff perfected this appeal.

Plaintiff's first assignment of error asserts, in essence, that the trial court erred in finding that defendants did not act under color of state law, and that, therefore, plaintiff failed to prove a necessary element of an action under Section 1983, Title 42, U.S. Code. Plaintiff relies upon the decision of the United States Supreme Court in *Estelle* v. *Gamble* (1976), 429 U.S. 97, as authority for the proposition that the workhouse medical personnel acted under color of state law in discharging their duties herein.

The Supreme Court, however, subsequently clarified its decision in *Estelle* in the case of *Polk County* v. *Dodson* (1981), 454 U.S. 312. In *Polk County,* a case involving a Section 1983, Title 42, U.S. Code claim against a court-appointed public defender, the court, at 320, distinguished *Estelle* and *O'Connor* v. *Donaldson* (1975), 422 U.S. 563, on the basis that the latter cases involved physicians serving in a custodial as well as a medical capacity. Thus, the Supreme Court stated, actions could be maintained pursuant to Section 1983, Title 42, U.S. Code, against a psychiatrist who was also serving as the superintendent of a state hospital (*O'Connor*) and against a physician who was the medical director of the Texas Department of Corrections (*Estelle*). No such action exists against a public defender, however, who, while employed by the state, acts only in the interest of the accused with no conflicting obligations to the state. *Polk County, supra,* at 320-322.

The rationale in *Polk County* is controlling herein. While Pangalangan was the "supervising physician," and indeed the only physician at the workhouse, the nature of his employment was clearly such that he was not acting under color of state law. He was employed under contract to provide medical services to the inmates at WCI, and owed no conflicting custodial duties to the city of Co-

lumbus. Roberts and Nolze were in similar positions, employed for the medical treatment of the WCI inmates, with no conflicting custodial obligations. They owed, as did the lawyer in *Polk County*, an undivided loyalty to their patients to render appropriate medical attention.

Consequently, construing the evidence most strongly in favor of plaintiff, reasonable minds could only conclude that plaintiff failed to prove that defendants acted under color of state law. *Strother* v. *Hutchinson* (1981), 67 Ohio St. 2d 282 [21 O.O.3d 177]. Therefore, the trial court did not err in directing a verdict on plaintiff's claim pursuant to Section 1983, Title 42, U.S. Code on this basis.

Accordingly, the first assignment of error is not well-taken.

Plaintiff also argues that the trial court erred in concluding that defendants had not violated Jackson's civil rights, pursuant to Section 1983, Title 42, U.S. Code. Plaintiff argues that it was for the jury to determine whether the actions of defendants deprived Jackson of the right to receive adequate medical care, the right to be free from wrongful segregation and the right as a pre-trial detainee to be free from punishment. The Supreme Court held in *Estelle, supra,* in connection with the right to receive adequate medical care, that simple malpractice does not support an action under Section 1983, Title 42, U.S. Code. Rather, the plaintiff must allege and prove acts or omissions sufficiently severe to constitute deliberate indifference to a serious illness or injury. In this case, reasonable minds could only conclude that plaintiff failed to prove such conduct.

Plaintiff contends that Pangalangan knowingly failed to conduct a six-week postpartum examination of Jackson, recognizing the importance of such an examination, and that he intentionally failed to establish an adequate system of record-keeping. Pangalangan, on cross-examination, testified that he was not competent to conduct a six-week examination, and scheduled Jackson for an examination at a clinic the following week. He kept some patient records and, while he conceivably did so in a manner below the accepted standard, such conduct does not demonstrate a deliberate indifference to a serious illness.

Further, plaintiff urges that Roberts displayed indifference in her cursory examination of Jackson for paralysis on the afternoon of June 1, improperly using an ammonia inhalant, trying to close Jackson's leg in a door, and declaring Jackson's complaints to be a "snow-job." Plaintiff also charges Roberts with failing to inform Pangalangan that Jackson was spitting up blood. Nevertheless, such examination techniques, while potentially negligent, were not evidence of deliberate neglect of a serious illness. She examined Jackson for distress and, finding none, kept her in the medical cell for further observation. Moreover, there is no competent evidence that Roberts was aware that Jackson was coughing up blood.

Plaintiff's arguments with regard to wrongful segregation and wrongful punishment of a pre-trial detainee relate to the confinement of Jackson to a cell block for medical observation. The evidence shows that there was no infirmary at WCI, and that sick or injured inmates were given beds in a cell block, instead of the dormitories, for purposes of observation or treatment. There was absolutely no evidence that Jackson was so confined for purposes of punishment, despite the fact that the cell block was also apparently used for discipline problems. Similarly, there is no evidence that Jackson was denied a lower bunk or visitation by her mother as punishment.

Thus, the second assignment of error is also not well-taken.

Plaintiff's third and fourth assign-

ments of error assert that the trial court erred in directing a verdict in favor of defendants on plaintiff's medical malpractice claim. As to Dr. Pangalangan, the trial court found that reasonable minds could only conclude that he acted in accordance with the applicable standard of care and that, in any event, no act or omission by Pangalangan proximately caused the death of Jackson. The trial court directed a verdict in favor of Roberts and Nolze on the basis that no act or omission by either nurse proximately caused the death of Jackson. It was, however, error to direct a verdict on these claims.

As noted above in determining a motion for a directed verdict, the trial court is to construe all evidence most strongly in favor of the party against whom the motion is made, in this case, plaintiff. *Strother* v. *Hutchinson, supra,* at 284; Civ. R. 50(A)(4). The court is not to weigh the evidence or determine matters of credibility, and is to grant the motion only if it determines that, construed most strongly for the nonmovant, the evidence is legally insufficient to support a verdict for that party. *Strother, supra; Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66 [23 O.O.3d 115].

In this case, there was testimony by expert witnesses that the conduct of defendants fell below the applicable standard of care for the treatment of an inmate-patient in Noble Jackson's position, and that such conduct was a proximate cause of her injuries and ultimate demise. Dr. Blank, qualified by the court as an expert witness, testified that Dr. Pangalangan's procedures for pill calls, information gathering and record keeping were, in his opinion, below the generally accepted standard of care and that accurate and thorough records are essential in the diagnosis of medical problems. He also noted that, in ninety-five percent of the cases, the diagnosis is made from the information volunteered by the patient.

Moreover, there was testimony of a witness, qualified as an expert on nursing care, that the conduct of the nurses was not within the accepted standard of care for examining patients and recording medical information, for informing the physician of their findings, and for dispensing medication to the patients.

A directed verdict may properly be granted on the issue of proximate cause, but only if there is no evidence adduced which would give rise to a reasonable inference that the negligent acts of defendants were a proximate cause of plaintiff's injury. *Kuhn* v. *Banker* (1938), 133 Ohio St. 304, paragraph two of the syllabus [10 O.O. 373]; *Cooper* v. *Sisters of Charity* (1971), 27 Ohio St. 2d 242, 250 [56 O.O.2d 146]. In this case, the testimony presented in plaintiff's case supports a reasonable inference that, if defendants had acted in accordance with the applicable standard of care, it was probable that Noble Jackson could have recovered. Thus, the trial court erred in directing a verdict for defendants on the medical malpractice claims.

The third and fourth assignments of error are well-taken.

For the foregoing reasons, the first and second assignments of error are overruled, and the third and fourth assignments of error are sustained. The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

*Judgment affirmed in part,*
*reversed in part,*
*and cause remanded.*

WHITESIDE and MOYER, JJ., concur.

WHITESIDE, J., concurring. Although I otherwise concur in the opinion and judgment, I concur in the overruling of the first assignment of error upon the limited ground that any error in the trial court determination as a matter of law that defendants did not act under color

of state law is not prejudicial for the reasons stated in the majority opinion in connection with the second and third assignments of error. This is simply a medical malpractice case, not one involving denial of constitutional rights, even assuming defendants, or any of them, acted under color of state law. It is unnecessary for this court to explore the application of either *Estelle* v. *Gamble* (1976), 429 U.S. 97, or *Polk County* v. *Dodson* (1981), 454 U.S. 312, both of which are distinguishable from the circumstances herein involved.