7 F.3d 235
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harold FRIEDMAN and Anthony Hughes, Defendants-Appellants.
 Nos. 92-3916, 92-3917.
 United States Court of Appeals, Sixth Circuit.
 Sept. 30, 1993.
 
 Before: KEITH and JONES, Circuit Judges; and PECK, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 This case concerns petitions for writs of error coram nobis based on ineffective assistance of counsel and due process of law following Defendants' convictions for union fund embezzlement, RICO charges, and filing false reports with the Secretary of Labor. Finding that Defendant-Appellant Harold Friedman's counsel employed competent trial strategies, and that there existed no state action to support Defendant-Appellant Anthony Hughes' due process claim, the district court denied the petitions without an evidentiary hearing. We concur in the district court's findings and affirm the judgment below.
 
 I.
 
 2
 Friedman and Hughes were officers of a local chapter of the International Brothers of Teamsters. On May 16, 1986, the grand jury returned an indictment charging Friedman with the following: 1) violating the RICO statute, 18 U.S.C. § 1962(c) (1988) (Count 1); 2) RICO conspiracy, 18 U.S.C. § 1962(d) (1988 & Supp.1993) (Count 2); 3) embezzlement of labor union funds, 29 U.S.C. § 501(c) (1988) (Counts 3 and 4); and 4) filing false reports with the Secretary of Labor, 29 U.S.C. § 439(b) (1988) (Counts 5 and 6). Hughes was also charged in Counts 1, 2 and 4. In general, the indictment alleged that for a decade Appellants conspired to and engaged in a criminal enterprise by embezzling funds through the payment of salaries to "ghost employees" who did no work.
 
 
 3
 The record shows that the jury acquitted Friedman on twenty-three of the twenty-six racketeering acts alleged in each of the RICO counts. Nevertheless, the jury convicted Friedman on Counts 1, 2, 4 and 6, and Hughes on Counts 1, 2 and 4. Both defendants were sentenced to serve four years on probation, pay fines, and forfeit their union positions and certain funds they accrued. The defendants pursued direct appeals, but this court affirmed their convictions.
 
 
 4
 On May 9, 1990, Friedman filed a motion for a new trial based on newly discovered evidence. The district court denied the motion on January 3, 1991, and this court affirmed that decision on September 24, 1991.
 
 
 5
 Having exhausted all other avenues of attacking his conviction, Friedman filed a petition for writ of error coram nobis on April 20, 1992. The petition claimed that his trial attorney deprived him of his Fifth and Sixth Amendment rights as a result of ineffective assistance of counsel. Also, Hughes filed a petition for writ of error coram nobis on May 20, 1992, asserting that conduct engaged in by codefendant Friedman's trial attorney violated Hughes' Fifth Amendment due process rights.
 
 
 6
 To support his petition, Friedman contends that Paul J. Cambria, petitioner's chief trial counsel, failed to mount an "authorization defense," that is, failed to claim that the government authorized the conduct in the indictment. Friedman alleges that the FBI recruited his codefendants Hughes and Presser (now deceased) as informants. He maintains Hughes and Presser provided information to be used to rid the union of organized crime influences. Friedman contends that the government authorized and directed Presser and Hughes to hire the "ghost employees" in order to curb possible gang violence against them.
 
 
 7
 Cambria did make a motion to dismiss the indictment based on the authorization defense, which the district court denied prior to trial. However, the court granted his motion to admit the affidavits of the FBI agents who allegedly authorized the conduct into evidence pursuant to Federal Rules of Evidence 804(b)(5). Then Cambria introduced the defense to the jury during his opening statement. Despite these efforts, Cambria did not continue the authorization defense during trial.
 
 
 8
 The district court made the following findings: 1) that the failure of Friedman's trial counsel to mount the authorization defense did not deprive him of due process or effective assistance of counsel under the Fifth and Sixth Amendments; and 2) that the government did nothing to interfere with Hughes' ability to present the authorization defense and that he voluntarily elected not to present that defense at the time of trial. Based on these findings, the district court denied both petitions of error coram nobis without an evidentiary hearing on August 28, 1992. This appeal followed.
 
 II.
 
 9
 At any time following the entry of judgment against a defendant, the writ of error coram nobis is available to a convicted criminal. Flippins v. United States, 747 F.2d 1089, 1091 (6th Cir.), cert. denied 481 U.S. 1056 (1987). We have a limited scope of review of a challenged judgment on a petition for writ of error coram nobis. United States v. Norman, 391 F.2d 212, 213 (6th Cir.), cert. denied, 390 U.S. 1014 (1968). "Under coram nobis the court reviews errors of fact committed in the original proceeding which are 'of the most fundamental character, that is, such as rendered the proceeding itself invalid." Flippins, 747 F.2d at 1091 (quoting United States v. Mayer, 235 U.S. 55, 69 (1914)). At a minimum, relief will not be granted unless it is probable that a different result would have occurred if the error of fact had been known to the trial court. Id.
 
 
 10
 With the standard of review in mind, we turn to examine the claims in this case of ineffective assistance of counsel and denial of due process of law. Finally, we address the district court's denial of Hughes' discovery requests.
 
 III.
 
 11
 The constitutionally guaranteed "right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970). For a defendant to prevail on an ineffective assistance of counsel claim, he must show 1) that counsel's performance was so deficient that counsel's errors deprived the defendant of the "counsel" guaranteed by the Sixth Amendment, and 2) that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The standard for measuring the attorney's performance is reasonable conduct under prevailing professional norms. Id. at 688. A court should not look back at a case with twenty-twenty hindsight and determine that counsel could have pursued a different defense. United States v. Lauga, 762 F.2d 1288, 1291 (5th Cir.), cert. denied, 474 U.S. 860 (1985). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Strategic and tactical decisions, even if clearly wrong in retrospect, cannot support a claim for ineffective assistance of counsel. United States v. Yancey, 827 F.2d 83, 90 (7th Cir.1987), cert. denied, 485 U.S. 967 (1988).
 
 
 12
 Trial counsel's tactics are not wholly immune from Sixth Amendment review, but the tactical decisions must be particularly egregious before they will provide a basis for relief. Martin v. Rose, 744 F.2d 1245, 1249 (6th Cir.1984). In Martin, the defense counsel literally stood mute at trial; he did not cross-examine any witnesses, interpose any objections, call any witnesses, object to any portion of the jury instructions, or deliver a closing argument. The attorney limited his opening statement to informing the jury that he would stand mute. Under those facts, this court found that the adversarial process had collapsed and the "tactic" of standing mute constituted ineffective assistance of counsel. Id. at 1250. "This was constitutional error even without any showing of prejudice." Id. at 1251.
 
 
 13
 In contrast with Martin, we cannot find that attorney Cambria's tactical decision to abandon the authorization defense was anything but an exercise of reasonable professional judgment. In this circuit, a criminal defendant is denied effective assistance of counsel where defense strategies and tactics are employed which lawyers of ordinary training and skill in criminal law would not consider competent, if another tactic would have defended the client better and this tactic was foreseeable at the time of trial. Beasley v. United States, 491 F.2d 687, 696 (6th Cir.1974).
 
 
 14
 The evaluation of defense counsel's performance must consider all the circumstances, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690. When we review all the circumstances surrounding this case, it must be noted that the FBI agents, who allegedly authorized the hiring of the employees, elected to assert their Fifth Amendment right not to testify on the matter, as did codefendant Hughes. Thus, the authorization defense could only be presented through affidavits, rather than through live witnesses. More importantly, the affidavits did not clearly establish that the FBI did authorize ghost employees.
 
 
 15
 The only evidence purporting to explain counsel's conduct at trial is Petitioner's Exhibit W, a letter from Cambria to Defendant Friedman dated April 24, 1991. Although the explanation for not pursuing the authorization defense came after the fact, the letter gave two reasons. First, Cambria points out the risk of arguing conflicting defenses. The main defense argued that the alleged ghost employees actually worked (or that Friedman relied on Presser's representation that they did so), while the authorization defense would have argued that the employees were authorized by the FBI to receive salaries and not work. Second, the trial record shows that an FBI special agent testified on voir dire that Presser did not become an informant until late 1976 or early 1977, well after one of the alleged ghost employees, John Nardi, was hired. In light of this, Cambria believed mounting an authorization defense would only weaken the main defense by highlighting what appeared to be the government's strongest piece of evidence: Nardi's uncontradicted testimony that he did absolutely no work for the salary he received.
 
 
 16
 In assessing counsel's overall performance, we accord substantial weight to the benefits attorney Cambria achieved for Friedman. Six counts of the indictment named Friedman. Two of those counts, both under the RICO statute, contained twenty-six predicate acts each. The jury acquitted Friedman on two substantive counts and on twenty-three of the twenty-six predicate acts in each RICO count. In addition, counsel Cambria's effectiveness as a sentencing advocate is supported by the punishment Friedman received: probationary sentence with no imprisonment.
 
 
 17
 Therefore, taking into account all circumstances at the time of trial, Cambria's strategy to not present the authorization defense was not only reasonable and logical, but was also, to a large degree, successful.
 
 
 18
 Friedman's second basis for writ of error coram nobis is that attorney Cambria mentioned the authorization defense during his opening statement, but never supported the defense at trial. It can be competent trial strategy to broach a defense during opening statement and later abandon it based on trial developments. See Howard v. Davis, 815 F.2d 1429, 1433 (11th Cir.), cert. denied, 484 U.S. 864 (1987); United States v. Bailey, 734 F.2d 296, 305-06 (7th Cir.), cert. denied, 469 U.S. 931 (1984). Further, to succeed on an ineffective assistance claim, the defendant must show that counsel's deficient performance prejudiced him such that he did not receive a fair trial. Strickland, 466 U.S. at 687. "Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " Id. at 692 (quoting Cuyler v. Sullivan, 446 U.S. 335, 348, 350 (1980)). Petitioner Friedman has introduced no evidence showing that Cambria's failure to present the defense prejudiced him. Moreover, nothing in the record remotely suggests that Cambria represented conflicting interests. The trial lasted two entire months; therefore, it is extremely unlikely that the jury distinctly remembered all the defenses mentioned in the opening statements.
 
 
 19
 Accordingly, we affirm the district court's denial of Friedman's writ of error coram nobis.
 
 III.
 
 20
 Hughes claims attorney Cambria violated his Fifth Amendment right to due process by not presenting the authorization defense and by threatening him with mob violence if he testified. The Due Process Clause does not extend to impose an affirmative obligation on the State to protect individuals from actions of private citizens. DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 195 (1989). Petitioner Hughes' allegations center around attorney Cambria's conduct and do not implicate the State. The conduct of privately retained counsel does not constitute state action, a necessary component of any due process claim. See Polk County v. Dodson, 454 U.S. 312, 317-19 (1981). In Polk, the Supreme Court held "that a lawyer [public defender] representing a client is not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983." Id. at 318. If a public defender whose salary is paid from state funds is not a state actor, a fortiori a private counsel is not one.
 
 
 21
 Finding that there existed no state action upon which to rest a due process claim, we affirm the district court's denial of Hughes' writ of error coram nobis.
 
 IV.
 
 22
 Hughes requested discovery of a significant amount of information relating to his former attorneys, the Climacos. The district court denied this request and issued protective orders barring such discovery. In a coram nobis action, the district court has discretion to apply the appropriate rules for discovery based on the facts of each case. See United States v. Balistrieri, 606 F.2d 216, 221 (7th Cir.1979), cert. denied, 446 U.S. 917 (1980). "The district court should consider the amount of time which has elapsed since the trial, the burden of discovery on the government and witnesses, and the nature of the applicant's claims in deciding on the scope of discovery at each stage of the coram nobis proceedings." Id. at 221-22. In denying Hughes' discovery request, the district court found that the requested documents were irrelevant and that production of the documents would be overly burdensome. We believe the district court did not abuse its discretion in so finding.
 
 
 23
 First, approximately three years had passed between the sentencing and the discovery request. Prior to Hughes' Reply to Government's Response in Opposition to Motion for Production of Documents there were never any suspicions raised about the Climacos being government informants.
 
 
 24
 Second, granting discovery would impose legal and practical burdens on the government. In this case, Hughes sought information located beyond the files of the prosecution; for instance, Hughes wanted to obtain information from the FBI on whether the Climacos had ever been informants. Furthermore, the documents requested numbered in the thousands.
 
 
 25
 Third, the nature of Hughes' coram nobis petition had absolutely nothing to do with the Climacos. The petition specifically alleged that attorney Cambria's conduct at trial violated his due process rights. Inquiry about the Climacos, who ceased representing Hughes several months before trial, was not even remotely related to attorney Cambria's trial conduct. This point alone justifies the district court's denying the discovery request.
 
 
 26
 The decision of the district court is affirmed.
 
 
 
 *
 Hon. John W. Peck, senior circuit judge, deceased September 7, 1993. Judge Peck participated in the oral argument but not the decision in this case