UNITED STATES of America,
Plaintiff,

v.

Dorothy STEWART, Defendant.

No. 12–60213–CR.

United States District Court,
S.D. Florida.

March 11, 2013.

Mark Dispoto, United States Attorney's Office, Fort Lauderdale, FL, for Plaintiff.

Robert Scott Gershman, Gershman & Gershman, P.A., Delray Beach, FL, for Defendant.

## ORDER

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon the Report And Recommendation (DE 76) filed herein by United States Magistrate Judge William Matthewman. No Objections have been filed to said Report. The Court has ·conducted a de novo review of the entire record herein and is otherwise fully advised in the premises.

On December 3, 2012, the Court held an evidentiary hearing on Defendant Stewart's Motion To Suppress (DE 22), and on December 4, 2012, Defendant Stewart was tried and found guilty of bulk cash smuggling in violation of 31 U.S.C. § 5332(a)(1), the single count charged in the Indictment. *See* DE 7. Following the jury's verdict,

during the discussion of whether or not Defendant could remain on bond, the Court questioned Defendant's lawyer, Robert Gershman, Esq., about whether he believed his client committed perjury when she testified. Subsequently, the Court referred this matter to Magistrate Judge Matthewman for an evidentiary hearing (DE 55), which was held on January 29, 2012. Mr. Gershman, John Cleary, Esq., co-counsel for Defendant, and Mark Disposto, Assistant United States Attorney, who represented the Government at trial in the instant case, testified at the evidentiary hearing.

In the instant Report (DE 76), Magistrate Judge Matthewman answers the series of questions posed by the Court with respect to Defense counsels' compliance with their professional and ethical responsibilities at the suppression hearing and Defendant's trial. Judge Matthewman concluded that: (1) Mr. Gershman and Mr. Cleary had no *actual* knowledge that Defendant intended to give perjurious testimony at the suppression hearing; (2) Mr. Gershman and Mr. Cleary, even after the suppression hearing, had no *actual* knowledge whether Defendant had lied on the stand, and that the testimony she would give at trial would likewise be perjurious; and (3) Mr. Cleary avoided referencing Defendant's perjurious testimony in his closing argument.

In his Report (DE 76) Magistrate Judge Matthewman discusses the application of the Rules Regulating the Florida Bar (hereinafter "Florida Bar Rules") to potential conflicts of interest and ethical and professional choices faced by the lawyer representing a client who may commit perjury. The Court will highlight two aspects of this discussion and provide additional observations.

■ First, and more broadly, the Florida Bar Rules demand that the lawyer act under obligations to his client and to the court. One of the lawyer's duties to the Court is that the · lawyer must act with candor toward the tribunal, which is discussed in Florida Bar Rule 4–3.3. In subsection (a)(4), this Rule explains how the duty of candor applies to prohibiting the offer of false testimony. Florida Bar Rule 4–3.3(a)(4). Among the lawyer's duties to his client, which may, at times, appear to conflict with this duty of candor to the court, is the duty of confidentiality of Rule 4–1.6. Additionally, in explaining one of the roles of the lawyer, the Preamble to the Professional Conduct Chapter, "A Lawyer's Responsibilities," states, "[a]s an advocate, a lawyer zealously asserts the client's position under the rules of the adversary system." Finally, relevant in the context of criminal defense, while a defendant has no fundamental right to commit perjury, he or she does have a constitutional right to testify, which is grounded in the Sixth Amendment. *See United States v. Ly*, 646 F.3d 1307, 1313 (11th Cir.2011) ("A criminal defendant has a fundamental right to testify in his defense," which is "more properly framed as a right to choose whether to testify" (*citing Rock v. Arkansas*, 483 U.S. 44, 52, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir.1992))); *United States v. Scott*, 909 F.2d 488, 490 (11th Cir.1990) (noting the widespread recognition of the defendant's right to testify as a 'fundamental right').

The American Bar Association's Model Rules of Professional Conduct serve as the basis for the Florida Bar Rules.[1] One

---

**1.** *See State Adoption of the ABA Model Rules of Professional Conduct,* ABA Center for Professional Responsibility (Mar. 8, 2013), http://www.americanbar.org/groups/professional_

responsibility/publications/model_rules_of_professional_conduct/alpha_list_state_adopting_model_rules.html.

commentator describing the coexistence of competing duties and the absence of an applicable hierarchy for resolving the conflicts in the Model Rules, concludes that, "[t]he multiple conflicting goals have produced a failed regulatory state." *See* Susan E. Thrower, *Neither Reasonable Nor Remedial: The Hopeless Contradictions of the Legal Ethics Measures to Prevent Perjury*, 58 Clev. St. L.Rev. 781, 817 (2010) ("If the ABA is serious about providing lawyers with a set of rules capable of satisfaction—as opposed to what it has now, which is a series of increasingly unreachable imperatives—it will start over with one goal in mind" and "choose whether the more important goal is client confidentiality or candor to the court"). It is without doubt that lawyers have competing duties—neither of which is unimportant—but when these duties conflict, lawyers need rules explaining which concern should be prioritized.

The Court also notes a second area of concern with respect to the Florida Bar Rules' treatment of a lawyer's competing responsibilities to the court and client, which in fact prompted the evidentiary hearing in this case. In light of the above-referenced concern that the Rules do not explain how a lawyer ought to navigate his duties, when faced with a perjury-bent client, Rule 4–3.3(a)(4) prioritizes candor to the tribunal when the lawyer finds himself in the position of "know[ing]" the evidence, or in this case, the witness's testimony, "to be false." Judge Matthewman's Report (DE 76) explains how both the Preamble to the Rules and the applicable case law indicate that the best interpretation of this knowledge requirement is that it requires *actual* knowledge. *See* DE 76, pp. 21–22. But the lawyer who has any degree of knowledge less than *actual* knowledge is placed in a precarious situation in which the Rule gives little guidance: "A lawyer may refuse to offer evidence that the lawyer *reasonably believes* is false." Rule 4–3.3(a)(4) (emphasis added). This distinction between actual knowledge and reasonable belief is problematic because of the motivations it stirs even in the lawyer who desires to fulfill all duties, to the court and to his client, with integrity. To illustrate the point, in a recent fictional portrayal of the sixteenth-century lawyer and statesman Thomas Cromwell, Cromwell describes the perennial complexity of the lawyer's relationship to the truth: "We are lawyers. We want the truth little by little and only those parts of it we can use." Hilary Mantel, *Bring Up the Bodies* 285 (2012).

The current Florida Bar Rule exacerbates this complexity with respect to what a lawyer would seek to learn about his criminal defendant client's testimony. L. Timothy Perrin, again discussing the parallel situation under the ABA Model Rules, describes the way this rule works in practice: "The high threshold required to satisfy the actual knowledge standard provides lawyers with the perfect means of avoiding application of Rule 3.3 [Model Rule parallel to Florida Bar Rule 4–3] when necessary. In a litigated matter, what does the lawyer know to a certainty? Defense lawyers who view their role solely in terms of winning and/or who resist any sense of obligation or responsibility for truth or justice, can avoid their client's perjury by rationalizing that they do not have sufficient certainty of the falsity of the defendant's testimony." *The Perplexing Problem of Client Perjury*, 76 Fordham L.Rev. 1707, 1725 (2007).

The Rule as it stands in Florida contributes to the difficulty of the ethical dilemma faced by criminal defense lawyers in the position of Mr. Gershman and Mr. Cleary. Lawyers who have doubts about whether their clients will commit perjury can only fully insulate themselves from all of the requirements of the Florida Bar Rules by making certain that they do not have com-

plete knowledge as to whether their clients will tell the truth on the stand. This remains troubling to the Court.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that the Report And Recommendation (DE 76) filed herein by United States Magistrate Judge William Matthewman be and the same is hereby approved, adopted, and ratified by the Court.

**DONE AND ORDERED.**

## *REPORT AND RECOMMENDATION*

WILLIAM MATTHEWMAN, United States Magistrate Judge.

THIS CAUSE is before the Court pursuant to an Order of Referral from United States District Judge William J. Zloch directing the undersigned to inquire into certain conduct of Robert Gershman, Esq. and John Cleary, Esq. in the scope of their representation of Defendant Dorothy Stewart [DE 55]. An evidentiary hearing was held on January 29, 2013, and the matter is now ripe for review. This Report and Recommendation will proceed as follows. Part I sets forth the factual and procedural background. Part II summarizes the evidentiary hearing. Part III describes the Court's factual findings. Part IV lays out the relevant legal standards. Part V answers the specific questions posed by the Order of Referral, and Part VI concludes.

### I. *Background*

On August 24, 2012, Defendant Dorothy Stewart was charged by way of a Criminal Complaint with bulk cash smuggling in violation of Title 31, United States Code, Section 5332(a)(1). *See* DE 1. A grand jury in this District later returned an In-

dictment charging her with the same substantive offense, as well as a forfeiture count. *See* DE 7.

On November 23, 2012, Stewart, by her retained counsel Mr. Gershman, filed a motion to suppress evidence of certain statements she made to law enforcement officers. DE 22. A hearing was held on the motion on December 3, 2012, during which Detective Jose Interian testified for the Government and Stewart testified for the defense. Mr. Cleary joined Mr. Gershman at counsel table during the suppression hearing. At the conclusion of the hearing, the Court took the matter under advisement. The next day, December 4, 2012, the Court orally denied Stewart's motion to suppress, and the case proceeded to trial. Although Gershman was Stewart's primary attorney during the course of the trial, her co-counsel Cleary gave the closing argument on behalf of the defense. At the conclusion of the one-day trial, a 12–member petit jury found Stewart guilty of the single count charged in the Indictment. After the verdict was returned and the jury was excused, Judge Zloch, who had presided over the case, and Mr. Gershman engaged in a colloquy regarding the veracity of Stewart's testimony at the suppression hearing and the trial. On December 18, 2012, Judge Zloch issued a five-page Order of Referral directing the undersigned United States Magistrate Judge to conduct an evidentiary hearing and make specific findings of fact with respect to whether Gershman and Cleary complied with their professional and ethical obligations during the course of their representation of Ms. Stewart.

### II. *Evidentiary Hearing*

An evidentiary hearing was held on January 29, 2013.[1] At the hearing, Mr. Gersh-

---

1. The Court first attempted to hold a hearing on this matter on January 15, 2013. On that date, the parties appeared with counsel and represented to the Court that they had not

had adequate time to obtain and review the transcripts from the motion to suppress hearing and the trial in the above-captioned matter. Accordingly, they requested a continu-

man appeared *pro se* and Mr. Cleary was represented by Larry Donald Murrell, Jr., Esq. Also present were Ms. Stewart, her new counsel Calvin Rivers, Esq., and Assistant United States Attorney Mark Dispoto. Mr. Gershman moved *ore tenus* to adopt Mr. Cleary's memorandum of law [DE 68] and supporting affidavit [DE 69], and the Court granted the motion. Mr. Cleary, Mr. Gershman, and Mr. Dispoto testified at the hearing. The Court questioned every witness and also afforded each of the parties an opportunity to question each witness. During the course of the hearing, the Court admitted as its Exhibit 1 certain samples of Dorothy Stewart's signature that were submitted to Judge Zloch in support of her motion to suppress.

In summary, Mr. Cleary and Mr. Gershman both testified that Stewart never told them she planned to lie on the witness stand, and they first learned of her challenge to the authenticity of the Government's CP–503 currency declaration form during the hearing on Stewart's motion to suppress. After the suppression hearing, Cleary and Gershman confronted Stewart about her testimony. Stewart insisted that her suppression hearing testimony was truthful and also insisted on testifying at trial. Although Gershman and Cleary were suspicious that Stewart's testimony was untruthful, they never had actual knowledge that it was, in fact, false.

Mr. Dispoto, the prosecutor, testified that he believed Cleary and Gershman acted ethically during the scope of their representation of Ms. Stewart. Mr. Dispoto also testified that in his opinion, Gershman and Cleary did not suborn perjury or knowingly submit the false testimony of Ms. Stewart.

### III. *Findings of Fact*

The following findings of fact are based on the record in this matter, the evidence and testimony received at the evidentiary hearing, and the undersigned's assessment of the credibility of the three witnesses who testified: Mr. Gershman, Mr. Cleary, and Mr. Dispoto.[2] The Court limits its findings here to those required to comply with the Order of Referral. Consequently, the ensuing findings should not be considered to be a comprehensive chronology of the proceedings in this matter.

### A. Early Discussions Between Client and Counsel

Prior to the hearing on Stewart's motion to suppress, her attorneys, Gershman and Cleary, attempted to convince her to plead guilty and forego a trial. Stewart declined to heed counsel's advice and insisted on a trial. Prior to the hearing on Stewart's motion to suppress, she did not have any discussions with her attorneys about the authenticity of the CP–503 currency declaration form provided by the Government in discovery. In her discussions with counsel prior to the suppression hearing, Stewart told them that she was not aware that she was required to declare currency when *leaving the* country. She also stated that did not consider the money that was eventually recovered in her luggage, which she claimed to be her husband's money, to be "her" money for the purposes of the currency reporting requirement. Finally, Stewart never told her counsel that she intended to lie in any of her upcoming testimony.

### B. The Suppression Hearing
#### a. Testimony of Jose Interian

On December 3, 2012, a hearing was held on Stewart's motion to suppress [DE

---

ance, and the matter was reset to January 29, 2013. *See* DE 67.

2. The Court found all three witnesses to be credible.

22] (the "suppression hearing"). At the suppression hearing, the Government called Detective Jose Interian of the Broward County Sheriff's Office. The following was elicited from Detective Interian during his direct examination by Assistant U.S. Attorney Dispoto. Detective Interian testified that on August 23, 2012, he was working at the Port Everglades Terminal in Fort Lauderdale, Florida. He testified that he saw Ms. Stewart travel through the security checkpoint en route to boarding a ferry bound for the Bahamas. Interian found Ms. Stewart's behavior to be "odd at best," contacted her, and told her that he was going to conduct an outbound currency examination. Interian asked Stewart whether she was carrying or transporting any money on her person or in her luggage; she replied that she was carrying $2,500 in cash.

Interian handed Stewart a CP–503 Currency Declaration form and asked her to read and fill out the form. In response to a question asking if she was carrying more than $10,000, Stewart circled "No." In response to a question that asked how much money she was transporting, she wrote "$2,500." A search of Stewart's purse revealed 29 bundles of U.S. Currency, which Interian estimated to be in excess of $10,000. Officers found 26 bundles of currency in a pink roller bag Stewart had with her and two bundles in a black roller bag she was transporting. Finally, Stewart removed three bundles of currency from the inside of her waistband. Stewart told agents that she had received the money from a person she knew only as "Maria" in a hotel room in Palm Beach County. Transcript, Dec. 3, 2012, DE 63 at 100.

**b. Testimony of Dorothy Stewart**

Defendant Stewart testified on her own behalf at the suppression hearing. The following was elicited from her during direct examination by Mr. Gershman. Stewart testified that she had a disability that prevented her from standing or sitting for long periods of time. *Id.* at 114. In discussing the currency declaration form presented to her by Detective Interian, Stewart recalled,

> He just—[Interian] asked me was I aware of the form that he described, and I told him no that I wasn't aware of the form. Then my cousin asked him what was the problem. And then he asked me how much currency I was carrying. How much currency was I carrying, and I told him 20–a little over $2,500. And then he said how much currency do you have on your person? And I said a little over $2,500.

*Id.* at 118:3–10. She then stated that she filled out the currency declaration form that was placed in front of her in accordance with Interian's instructions. She never actually read the form, but instead only wrote down and circled what Interian told her to mark and circle. *Id.* at 121. Additionally, she signed the form only because Interian told her to do so. She did not understand the form, nor did she understand what Interian was telling her about the money. During the course of her interaction with Interian, Stewart told him several times that she did not understand the procedure or the form. *Id.* at 122.

On cross-examination, and without objection, Assistant U.S. Attorney Dispoto introduced a CP–503 currency reporting form into evidence as Government's Exhibit 1. Mr. Dispoto went through the form with Stewart. At some point, however, Stewart asserted that Government's Exhibit 1 was not the same form she filled out on August 23, 2012. She stated:

> **THE WITNESS [Stewart]:** Could I say something?
>
> **THE COURT:** Show her the language.
>
> **THE WITNESS:** I see the language, but I have a problem here. The form

that he gave me that I filled out doesn't look like this form here.

*Id.* at 136. After asking about certain other matters, the prosecutor came back around to the issue of whether the currency declaration form presented in court was the same one presented to Stewart at the Port Everglades terminal:

**Q.** Well, Let's back up a little more because you mentioned a few moments ago that there was something about the form that I placed in front of you that you didn't recognize. Is this the form that you filled out at Officer Interian [sic] instructions on August 23rd of 2012?

**THE COURT:** Government's 1.

**BY MR. DISPOTO:**

**Q.** Exhibit 1

**A.** The form that I filled out looks a little different. The form that was in front of me looks a little different.

**Q.** How does it look different?

**A.** The top with the-that wasn't there on the form that I filled out.

**Q.** Okay. What was there instead of what's on top?

**A.** There was nothing there.

**Q.** So it was all blank?

**A.** Yes. There was nothing there.

**Q.** The bottom half of the form that starts with the question that I just asked, was that there, the bottom half of the form?

**A.** Yes

**Q.** So, as you look at the bottom half of this form-We're going to talk about it in a few more minutes. But when you look at the bottom half of this form is this—is this the form that you were asked to fill out on August 23rd of 2012?

**A.** The bottom half, yes.

**Q.** Okay. But the top half was blank.

**A.** Yes. I don't recall any of that up at the top of the form.

**Q.** The bottom of the form does contain your name, right, presented, Dorothy Stewart?

**A.** Yes.

**Q.** That's your handwriting, correct?

**A.** Yes.

**Q.** And then in the center of the bottom of the form is a signature. That is your signature, is it not?

**A.** No. I do not recognize it as my signature.

**Q.** Really? That's not your signature. Do you have difficulties, Ma'am, recognizing your own signature?

**THE COURT:** Well, let her answer the question.

**THE WITNESS:** No, I don't have difficulties recognizing my own signature.

**THE COURT:** The question is, is that your signature on Government's Exhibit 1.

**THE WITNESS:** No, that's not my signature.

**BY MR. DISPOTO:**

**Q.** And the date that's to the right of that, it says 8–23–2012. Do you see that?

**A.** Yes, I do.

**Q.** Is that your handwriting?

**A.** To be honest, none of this looks like my handwriting.

**Q.** Well, let's go back to your-you told me two minutes ago that Dorothy Stewart, the name, not the signature but the name, you just told me two minutes ago was your handwriting.

**A.** If you look at that Stewart is spelled wrong.

**Q.** Okay.

**A.** Okay. I should know how to spell my name.

**Q.** Ma'am, I'm simply asking you whether you wrote this or not. It's hard to—it's hard to read what exactly it

says, the Stewart name. I'm simply asking you, did you write that on the form?

A. I can't say that I wrote on this form. It doesn't look like my handwriting to me.

Q. So, you are not willing to say that this name, signature, or date is your handwriting.

A. The signature definitely doesn't look like my signature.

*Id.* at 142:17–145:6. In response to further questioning, Stewart admitted that she wrote "$2,500" on *a* form, but did not recognize the "$2,500" that was written on Government's Exhibit 1 as her handwriting. *Id.* at 146. In response to a question asking "How many pieces of checked luggage and/or carry luggage are you transporting with you?" the number 5 was handwritten on Government's Exhibit 1. But Stewart said she did not recall writing the number 5. *Id.* at 147. Importantly for present purposes, Mr. Gershman declined the opportunity to redirect Stewart at the suppression hearing.

### C. Stewart's Discussions with Her Attorneys After the Suppression Hearing hand Prior to Trial

After the suppression hearing, Stewart's attorneys were disappointed with her testimony. While the basis of Stewart's motion to suppress statements was that she had been unconstitutionally interrogated in contravention of the Supreme Court's holding in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), they felt Stewart had volunteered testimony that was not supportive of that contention. They were also surprised at her challenge to the authenticity of the Government's currency reporting form,' the suppression hearing was the first they had heard of this claim.

After the suppression hearing, Gershman and Cleary spoke with Stewart. They advised her that her testimony, espe-

cially her claim that Government's Exhibit 1, the currency reporting form, was forged, was largely incredible. They told her that a jury was unlikely to believe her story. Stewart insisted, however, that she was telling the truth. Gershman asked Stewart if she had anything to substantiate or verify her version of events, and they discussed the idea of providing the court with other exemplars of her true signature. Gershman and Cleary advised Stewart not to testify at the trial the next day. They felt that she was not a believable witness and that it would be detrimental to her defense if she did so. Over her attorneys' objections, Stewart insisted on testifying at trial.

Gershman and Cleary discussed the appropriate course of action among themselves. After meeting with Stewart, and based on her suppression hearing testimony, Gershman and Cleary both suspected that she might not be telling the truth. But they had no evidence or contravening facts to show that she was being dishonest. Neither Gershman nor Cleary had actual knowledge that Stewart was lying; to the contrary, she insisted just the opposite. Gershman had a hunch that Stewart was lying, and did not want to elicit testimony from Stewart that he did not believe. In an abundance of caution, and fearful of suborning perjury, he consulted with Cleary and they decided that it would be most appropriate to have Stewart testify in the narrative.

### D. Pretrial Discussions

The next day, December 4, 2012, court resumed. Before the parties could address the Court, the Court orally denied Stewart's motion to suppress. Immediately thereafter, the following dialogue ensued:

**MR. GERSHMAN:** May I be heard on one thing, Judge?

THE COURT: Sure.

MR. GERSHMAN: In no way trying to argue with the Court's ruling. This morning the defendant asked me to make the following request of the Court in a—what I perceive to be almost a supplement to the written motion to suppress. She has requested that the Court consider a few sheets of paper in furtherance of showing the Court that on the sheets of paper the signatures that appear thereon, which I—she would proffer will be her actual signatures differ and are not the same as the signature on the reporting requirement form, and ask the Court to right now for a proffer to consider that testimony in support of the originally filed motion to suppress at Docket 22.

Transcript, Dec. 4, 2012, DE 64 at 4–5. The court accepted the exhibit, which consisted of two copies of Stewart's Florida Driver License, a "Firearms/Weapons Statement" that Stewart signed after she was granted bond in the instant proceeding, and a copy of her appearance bond reflecting two instances of her signature.[3] Stewart had handed Gershman the documents earlier that morning and insisted that they be submitted to the Court to corroborate her account that the signature on Government's Exhibit 1 at the suppression hearing was not hers. After reviewing the exhibit, the Court declined to alter its previous ruling denying Stewart's motion to suppress.

### E. Interian's Trial Testimony

The Government's only witness at trial was Detective Interian, who had testified the previous day at the suppression hearing. Interian's testimony at trial was largely consistent with his testimony at the previous day's suppression hearing. With-

out objection, the Government again introduced the CP–503 currency reporting form that Stewart purportedly signed on August 23, 2012 into evidence as Government's Exhibit 1.[4]

### F. Stewart's Trial Testimony
#### 1. Direct Examination

After the Government rested its case and the Court denied Stewart's Rule 29 motion, Mr. Gershman informed the Court that the defense's only witness would be the defendant, Stewart. But before Stewart was called to the stand, the following exchange ensued:

MR. GERSHMAN: May I bring up one thing in furtherance of that, please, Judge?

THE COURT: Go right ahead.

MR. GERSHMAN: If the Court permits I would ask the Court when I am done with the biographical nature of the questions to be able to pose open-ended narrative type questions to the defendant and let her answer thereupon.

THE COURT: Well, let's proceed in this fashion. If the Government has an objection then they can voice it at the appropriate time and then I will consider your request because I really need to hear—

MR GERSHMAN: Thank you, Judge.

THE COURT:—how would you be proceeding before I could give you an opinion on it.

MR. GERSHMAN: Thank you, Judge.

*Id.* at 95:23–96:12. According to Gershman, this exchange was his way of advising the court that he was not comfortable with eliciting testimony of which he was suspicious. Based on his previous experience in

---

**3.** A copy of this exhibit was introduced as Court's Exhibit 1 at the January 29, 2013 evidentiary hearing before the undersigned.

**4.** According to Gershman, he did not object to this evidence because he did not know of a lawful objection.

a previous federal criminal trial in the Southern District of Florida, Gershman believed he was adequately informing the Court that his client's testimony was suspect. Moreover, Cleary concurred in Gershman's decision to put Stewart on in the narrative.

After this initial exchange, Stewart testified on direct examination. She described her education level, the condition of her health, and an unfortunate previous experience with a foreign customs official. Gershman then asked, "Do you remember entering—or first arriving and then entering the terminal at Port Everglades in Broward County?" to which Stewart answered, "Yes." Gershman then told Stewart to describe the events of August 23: "If you can from there tell the jury what you were doing, who you were with, and what happened, please." *Id.* at 104. At that point, Stewart began testifying largely in the narrative, with Gershman interrupting only a few times to direct her with open-ended questions, such as "Is there anything else you wish to tell the jury concerning that statement or that person?" *Id.* at 110:13–14. During this narrative testimony, Stewart gave her version of events as to the August 23rd incident and described her interaction with Detective Interian. She concluded with a claim that an undocumented immigrant named "Maria," a sometime domestic helper for the Stewart family, had packed the recovered currency in her bags. At no time during Stewart's testimony did the Government lodge an objection to the narrative format.

### 2. Cross Examination

On cross examination, Mr. Disoto showed Stewart the currency reporting form that had previously been introduced as Government's Exhibit 1. Consistent with her testimony the previous day at the suppression hearing, Stewart claimed that, although she had filled out a similar form on August 23, Government's Exhibit 1 was not the form she signed:

> This is not the form that was presented to me.... I am not denying that I signed the form but I am—this is not the form I signed.... I wrote my name in print and I signed my name on a form when I was with Mr. Interian, but this form is not the form that I recall doing that on. This is not my signature.... I do not recall this form.... Like I stated earlier, this is not the form that was presented to me on August 23rd.

*Id.* at 128–134. At the conclusion of Stewart's testimony, Mr. Gershman again declined to conduct a redirect examination.

### G. Closing Arguments

At the conclusion of the evidence, the parties presented closing arguments to the jury. In his initial argument, the Assistant U.S. Attorney called Stewart "an incredible witness" who was "not worthy of belief." *Id.* at 160. Mr. Cleary gave the closing argument on behalf of Ms. Stewart. Cleary's argument made no mention of the dispute regarding Government's Exhibit 1. Rather, he focused on whether Stewart had the requisite *mens rea* to be convicted of the currency smuggling offense. He also pointed out that the Government did not present any objective documentary evidence of the August 23rd encounter, such as an audio recording or a videotape. Rather, Cleary concluded, what was before the jury was "one person's testimony against another person's testimony," *id.* at 170, and that created reasonable doubt. Cleary testified at the evidentiary hearing that he did not believe Stewart's trial testimony challenging the authenticity of Government's Exhibit 1 or her testimony about "Maria" packing the bags and did not think a jury could be persuaded by those contentions. Accordingly, he and Gershman made a deliberate, conscious de-

cision to avoid those subjects in the closing argument.

On rebuttal, Mr. Dispoto immediately and ably pounced on what was *not* in Cleary's argument—Government's Exhibit 1. As soon as Mr. Cleary sat down, Mr. Dispoto started:

> The most significant inaccurate statement that Mr. Cleary just made was that there is no verification, no corroboration, and substantiation of what Officer Interian testified to in this case. That is completely false, because the corroboration that you have is the currency reporting form. Her handwriting. Her signature. That is the corroboration.

*Id.* at 171. He continued:

> By the way, Mr. Cleary stood up here for a good 15 or 20 minutes. *Did he say one thing about this form ? Did he say anything about his client's contention that this was not his signature ? Did he argue to you any corroboration that this is not her signature ?.* . . . I would ask you, ladies and gentlemen, keep your eye on the ball. The ball in this case is the reporting form, and if you find that Miss Stewart's testimony about the reporting form is not credible . . . . then you must, you must find her guilty because this is the overwhelming evidence against her, her own handwriting despite what she tells you.

*Id.* at 172,174 (emphasis added).

## H. Post–Verdict Discussions with the Court

After closing arguments, the Court charged the members of the jury and they retired for deliberations. Barely 15 minutes later, the jury found Stewart guilty of the sole count of the Indictment. *Id.* at 185:24, 187:22. After the jury was excused, the Court asked the parties for their positions on the issue of whether Stewart should be permitted to remain free on bond pending sentencing.

As Mr. Gershman started to argue Stewart's position on bond, the Court interceded and the following lengthy exchange ensued:

**THE COURT:** Let me ask you a question. I know that you get upset when the Court asks questions. But let me ask you a question or two or three. Who committed perjury in this case?

**MR. GERSHMAN:** As an officer of the Court if anybody did, it would be the defendant.

**THE COURT:** Well, it was either Miss Stewart or it was Officer Interian.

**MR. GERSHMAN:** I think the jury spoke as to that.

**THE COURT:** And the jury made a decision obviously about that. You would agree with that, correct?

**MR. GERSHMAN:** I think it was always a matter of credibility, Judge.

**THE COURT:** Because if Officer Interian committed perjury then you would agree that he would be committing perjury or false swearing. You would agree with that, correct?

**MR. GERSHMAN:** I'm sorry, would you say that again? I didn't understand.

**THE COURT:** Let me slow it down for you. If Officer Interian committed perjury then you would agree that he would be committing perjury then you would agree with me that he committed the crime of perjury and/or false swearing. Would you agree with that?

**MR. GERSHMAN:** Yes sir.

**THE COURT:** All right. And if Officer Interian committed perjury then he fabricated evidence. Would you agree with that?

**MR. GERSHMAN:** I think it could be either that or without fabrication in that scenario testimony concerning—

THE COURT: Well, your client said—your client said that she had nothing to do with the form, Government's Number 1. She said, first of all, that wasn't the form that she signed. She denied that it was her signature. She said the only thing on there that she recognized was $2,500. She said everything else was done at what Interian told her. So, you would agree that he fabricated evidence. Would you agree with that or not?

MR. GERSHMAN: No, I don't agree with that.

THE COURT: Oh, you don't think he fabricated evidence then if your client is telling the truth.

MR. GERSHMAN: My opinion is—

THE COURT: I did not ask you for your opinion. I wanted to know if you agree with the Court. If your client is telling the truth[,] Did Officer Interian fabricate evidence—

MR. GERSHMAN: Possibly.

THE COURT:—and commit a crime in doing so if your client is telling the truth.

MR. GERSHMAN: If my client is telling the truth, yes, sir.

THE COURT: But you would agree that obviously by the jury verdict the jury rejected your client's testimony.

MR. GERSHMAN: And I would add not only that, Judge. If you remember at the beginning of the testimony when I asked the Court for the—what I thought was the appropriate process, that is, allowing me to ask biographical and then ask narrative.

THE COURT: Right. You weren't precluded from doing that. The Government never objected to anything.

MR. GERSHMAN: I just don't—I don't want—and I don't know what the Court is thinking in this regard. I had obviously in preparation for had anticipated certain testimony, had evidence be used and discussions with the Govern-ment and knew what was coming. So that is how I came to ask the Court for me to follow what I thought was the appropriate rules of conduct as representative to ask—

THE COURT: Well, you should have brought that up at sidebar. I mean, how am I supposed to know that you are putting the Court on notice that your client might be committing perjury?

MR. GERSHMAN: By asking to-my method in doing that was when I asked the Court—

THE COURT: By saying to the Court, oh, by the way, Judge. If I ask—Can I ask narrative type questions that is supposed to put the Court on notice that your client might be on the verge of committing perjury?

MR. GERSHMAN: I assumed that, yes.

THE COURT: Oh, interesting. That is an interesting assumption. Very interesting.

*Id.* at 193–96. There was then a brief return to the question of whether Stewart should be able to remain on bond, but the Court then again questioned the veracity of Stewart's testimony:

THE COURT: I thought you stated earlier as an officer of the Court you were representing to the Court that your client committed perjury.

MR. GERSHMAN: I thought—

THE COURT: Or did I misunderstand you [?]

MR. GERSHMAN: I tried to alert the Court in the way that I thought was appropriate that—

THE COURT: I thought that you said earlier when I asked you who committed perjury in this case, I thought you responded to the Court, and I can have the court reporter read it back—

MR. GERSHMAN: I said that based on the jury's verdict.

THE COURT:—that you said as an officer of the Court your client committed perjury.

MR. GERSHMAN: Yes, sir, I did say that.

THE COURT: All right. Go ahead.

MR. GERSHMAN: And I base that upon the jury's verdict of accepting government evidence and rejecting her evidence. That would be my argument, Judge, as going back to the remand issue.

THE COURT: Well, are you saying that if the Government had-excuse me. Are you saying that if the jury had returned a verdict of not guilty that your client would not have committed perjury?

MR. GERSHMAN: Again, sitting here in open court, Judge, before the verdict—I again maybe in a misinformed and juvenile way tried to alert the Court that I thought it was coming even before the verdict came. So my thought to you was, I can't suborn it so I don't want to ask specific questions about it. That's why I asked for the narrative.

THE COURT: Are you saying that if the jury had returned a verdict of not guilty that your client would not have committed perjury in this case?

MR. GERSHMAN: I think no matter what the verdict was there was perjury committed if that's what you're asking on a direct statement to me standing here, Judge. And I hear, you know, my client's family in the back calling me ineffective and other things, but that's what I tried to tell the Court yesterday when I was talking about narrative and answering the Court's questions honestly now. I could go further into, you know, conversations I had with the defendant regarding whether to go to trial or not, and the pros and cons. I am

trying to-I am being honest with the Court as to my—

THE COURT: No. I understand that. I understand that.

MR. GERSHMAN: I think I'm being honest to the extent that, you know, this testimony is going to be transcribed and stuck in a 2255 against me because of these issues. So I find my duty to the Court overriding anything else right now in answering openly—

THE COURT: And it does. And it does. Your duty to the Court does override everything else and I appreciate your candidness.

*Id.* at 197–99. Finally, after determining that he would revoke Stewart's bond, Judge Zloch turned to the prosecutor:

[THE COURT:] Mr. Dispoto, did you know that this was coming, the perjury aspect?

MR. DISPOTO: Today I did based upon yesterday's [suppression hearing] testimony. But prior to yesterday I had no idea what she was going to say.

*Id.* at 199:11–15. The discussion then moved to how much money Stewart should forfeit as a result of her conviction. After a discussion, Judge Zloch offered Mr. Gershman the opportunity to brief the matter, and he responded as follows:

MR. GERSHMAN: My hesitation is this, Judge. I think from the conversation we had a few minutes ago the defendant is not going to want me to do anything for her anymore. So, although ore tenus motions are uncommon and frowned upon in federal court, I don't see how the defendant is going to want me to speak on her behalf for anything, whether it be money or freedom.

I wanted to add one other thing, Judge. When I advised the Court of that sort of procedure I was hiding nothing. In fact, beforehand I had mentioned to the other

litigants what my intent was. I did so in good faith. I did so what I thought was following the rules appropriately and I still think that was the proper way to go. But obviously it was not sufficiently informative. So, for that I apologize.

**THE COURT:** Well, I have never had it done that way, and I have been sitting since 1985 doing this. It has either been done out of the presence of the jury during a break before a witness, or an individual, or a defendant would testify or it was always done right over there at sidebar. This is an absolute first. But there is always a first time for everything, right?

**MR. GERSHMAN:** Yes, sir.

**THE COURT:** So now you know my position.

**MR. GERSHMAN:** Yes. Of course.

**THE COURT:** Not once since 1985. This is the first time. All right. Anything else from the defense?

**MR. GERSHMAN:** No, sir.

*Id.* at 204:1–205:3. Judge Zloch then turned to the Assistant U.S. Attorney:

**THE COURT:** I am just curious. Why didn't the Government alert the Court and ask for a sidebar?

**MR. DISPOTO:** As I indicated before, Judge, prior to the motion to suppress I didn't know what the witness was going to say. So there would be—there was no opportunity for me to alert the Court of that. And once your honor heard—

**THE COURT:** I'm talking about today.

**MR. DISPOTO:** Well, your honor heard the testimony that she gave yesterday just as the Government did. I had no reason to believe that she would testify any differently. So, I was on the same notice that the Court was regarding what she was going to say today because of what she testified to yesterday. I had no additional inclination that she was going to testify any differently than she did yesterday.

**THE COURT:** Well, maybe I misunderstood you. But I thought I understood you to say that you had had discussions—and it is my error if I misunderstood you. But I thought—did you have any discussions with defense counsel about the perjury issue—the possible perjury issue?

**MR. DISPOTO:** Prior to the motion to suppress?

**THE COURT:** No, prior to today.

**MR. DISPOTO:** No.

**THE COURT:** All right.

**MR. GERSHMAN:** I don't want Mr. Dispoto to take the blame for something the Court may think I did wrong, Judge.

**THE COURT:** No. That is all right. That is all right.

*Id.* at 205:4–206:5. Mr. Gershman then again alluded to the fact that he would likely be moving to withdraw, and the Court instructed him to file an appropriate motion. Both Gershman and Cleary subsequently filed motions to withdraw, which the Court granted. *See* DE 53. Stewart is presently represented by Robert Calvin Rivers, Esq. and W. George Allen, Esq.

### IV. *Applicable Standards*

Attorneys practicing before this Court are governed by, *inter alia,* the Rules Regulating the Florida Bar. *See* S.D. Fla. L.R. 11.1(c). Among these rules is one entitled "Candor Toward the Tribunal," which states, in relevant part:

A lawyer shall not knowingly:

. . .

(4) offer evidence that the lawyer knows to be false. A lawyer may not offer testimony that the lawyer knows to be false in the form of a narrative unless so ordered by the tribunal. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer

comes to know of its falsity, the lawyer shall take reasonable remedial measures including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

RULES REGULATING THE FLA. BAR R. 4–3.3(a) (2012) ("Fla. Bar R."). In turn, "knowingly," "knows," and "known" are defined as terms indicating actual knowledge of the fact in question. *Id.* R. 4 pmbl. It is clear, then, that the rules prohibit an attorney from eliciting testimony from a client where the attorney has actual knowledge that the client is going to testify falsely.[5] Although the rule does not define "actual knowledge" any further, a number of courts have recognized it as having at least "a firm factual basis" that one's client will perjure herself. *See United States v. Del Carpio–Cotrina,* 733 F.Supp. 95, 99 (S.D.Fla.1990) (collecting cases). *See also Shockley v. Delaware,* 565 A.2d 1373, 1379 (Del.1989) (attorney must have knowledge "beyond a reasonable doubt" before acting under rule demanding candor to the tribunal).

 The attorney's course of action is murkier, however, when he does not know that his client is about to lie, but merely "reasonably believes" that the client will do so.[6] Under these circumstances, the Florida rule appears to afford the attorney considerable discretion: he may choose whether or not to call the client to the stand. In a civil proceeding, this rule is relatively easy to apply, as an ordinary civil litigant has no Sixth Amendment right to compulsory process. *See Coleman v. Balkcom,* 451 U.S. 949, 954 (1981) (Stevens, J., concurring in denial of the petition for certiorari).

Criminal defense attorneys, however, must approach the rule demanding candor with greater caution. "The obligation of candor is often-cited and ill-defined. In almost no factual context is there a consensus on what the [criminal] defense lawyer is (and is not) required to do in order to fulfill this obligation of candor." John D. King, *Candor, Zeal, & the Substitution of Judgment: Ethics & the Mentally Ill Criminal Defendant,* 58 AM.U.L.REV. 207, 219 (2008).

██ ██ Unlike in the typical civil dispute, criminal defendants may not only find themselves facing the loss of "life, liberty, or property," but being deprived of all three. Accordingly, they are afforded special constitutional protections. *See, e.g.,* U.S. Const. art. I, § 9 cl. 3 (no ex post facto laws); *id.* amend. V (requiring Indictment for serious crimes; requiring due process; protection against self-incrimination); *id.* amend. VI (right to counsel, jury trial, speedy trial, confrontation). Additionally, the courts have interpreted the Constitution as granting a criminal defendant a fundamental right to testify. This is a "recognized fundamental right" that cannot be waived by counsel. *United States v. Scott,* 909 F.2d 488, 490 (11th Cir.1990) (citations omitted). *See also United States v. Teague,* 953 F.2d 1525, 1532 (11th Cir.1992) (en banc) (characterizing Supreme Court's recognition of "right to testify" more accurately as right to *choose* whether to testify); Fla. Bar R. 4–1.2(a) ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to ... whether the client will testify"). It is true that a lawyer cannot suborn perjury. But even

---

5. Unless, of course, the Court orders the attorney to present the testimony in the narrative. Fla. Bar. R. 4–3.3.

6. For these purposes, a lawyer "reasonably believes" something when he or she actually believes a fact in question and that belief is objectively reasonable. *See* Fla. Bar R. 4 pmbl.

where an attorney strongly suspects that his client is about to commit perjury, the attorney cannot keep a criminal defendant off the stand. To do so would violate the defendant's "fundamental right to testify in his defense." *United States v. Ly,* 646 F.3d 1307, 1313 (11th Cir.2011). *See Rock v. Arkansas,* 483 U.S. 44, 49–53, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). *See also United States v. Litchfield,* 959 F.2d 1514, 1517–18 (10th Cir.1992) (noting with approval district court's admonition to criminal defense counsel who informed court that he did not "feel comfortable" being part of his client's testimony where counsel was "concerned" that client's direct testimony would "include untruths").[7]

■ The criminal defense lawyer's worries do not end with the client's right to testify. An attorney, especially a criminal defense attorney, has an obligation to zealously represent his or her clients. "In our system a defense lawyer characteristically opposes the designated representatives of the State. The system assumes that the adversarial testing will ultimately advance the public interest in truth and fairness. But it posits that a defense lawyer best serves the public, not by acting on behalf of the State or in concert with it, but rather by advancing the undivided interests of his client." *Polk Cnty. v. Dodson,* 454 U.S. 312, 318–19, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal quotation marks omitted). The ideal of zealous advocacy is also recognized in the ethical rules that govern the conduct of lawyers. *See* Fla. Bar R. 4 pmbl. cl. 2 ("As an advocate, a lawyer zealously asserts the client's position under the rules of the

adversary system."); MODEL R. PROF'L CONDUCT pmbl. cl. 2 (2004) (same). *See also* Am. Bar Assn., STDS. FOR CRIM. JUSTICE PROSECUTION FUNCTION & DEFENSE FUNCTION § 4–1.2 (3d ed.1993) (duty of criminal defense counsel as advocate).

■ Finally, the criminal defense attorney must also uphold his or her duty of confidentiality. Every lawyer admitted in this state takes an oath to "maintain the confidence and preserve inviolate the secrets of [his or her] clients." Fla. Bar, Henry Latimer Ctr. for Professionalism, *Oath of Admission to the Florida Bar,* Sept. 13, 2011, *available at* http://www.floridabar.org/tfb/TFBProfess.nsf/basic+view/04E9EB581538255A85256B2F006CCD7D?OpenDocument. The ethics rules similarly require that attorneys keep client information confidential during and after the representation, with only limited exceptions. *See, e.g.,* Fla. Bar R. 4–1.6.[8]

■ When evaluating the conduct of criminal defense lawyers, it is important to be mindful that the rule demanding candor to the tribunal does not operate in a vacuum,' it must be balanced with competing obligations. A criminal defendant's constitutional right to testify is sacrosanct. The American Bar Association's Model Rules of Professional Conduct reflect this reality. *See* MODEL R. PROF'L CONDUCT R. 3.3(a)(3) (2002) ("A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false."); *id.* cmt. 9 ("Because of the special protections historically provided criminal defendants, howev-

---

**7.** This, of course, is the very reason that the narrative approach has been embraced by so many jurisdictions as a reasonable compromise for the advocate who finds himself in an ethical conundrum.

**8.** This Court is hardly the first to recognize the difficulties that may arise when attorneys

simultaneously endeavor to do right by the court and by their clients. Indeed, these problems have been discussed in the academic literature for generations. *See, e.g.,* Monroe H. Freedman, *The Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions,* 64 U.MICH. L.REV. 1469 (1966).

er, this Rule does not permit a lawyer to refuse to offer the testimony of such a client where the lawyer reasonably believes but does not know that the testimony will be false"). The last sentence of Florida Bar Rule 4–3.3(4), however, contains no such exception for situations involving criminal defendants. This omission places that portion of the Florida rule at odds with the "special protections historically provided criminal defendants."[9]

The Court is troubled that the current iteration of Florida Bar Rule 4–3.3(a)(4) fails to provide sufficient guidance to criminal defense attorneys who suspect or reasonably believe that their client will offer or has offered false testimony. The criminal defense lawyer who reasonably believes—but does not know—that his client will commit perjury faces a Hobson's choice. If he offers his client's testimony, he may be accused of offering false evidence; if he refuses to offer that testimony, he may be accused of violating the defendant's constitutional rights and later face claims of ineffective assistance of counsel. As noted above, the Model Rule makes some effort to address this dilemma; the Florida rule does not.[10]

Nevertheless, in deciding the instant matter, the Court is constrained by the applicable ethical and professional rules that were in place in December 2012. With this in mind, the Court now proceeds to answer each of the specific questions

posed by the Order of Referral in accordance with those rules.

### V. *Discussion*

**A. Whether Robert Gershman, Esq., and John Cleary, Esq., complied with their professional and ethical responsibilities in properly informing the Court that their client, Defendant Dorothy Stewart, might give perjurious testimony at the evidentiary hearing on Defendant's Motion to Suppress and/or at the trial of the above-styled cause.**

■ Under the Rules of Professional Conduct, an attorney is required to inform the Court where he has actual knowledge that his client intends to give perjurious testimony in a judicial proceeding. Here, Gershman and Cleary did not learn of Stewart's contentions about the inauthenticity of Government's Exhibit 1 until she made those allegations on cross-examination at the suppression hearing on December 3, 2012. During the recess between the suppression hearing and the trial, Stewart's attorneys confronted her about this testimony and told her that it was not believable. They attempted to dissuade her from testifying, but she held firm and insisted that her version of events was the truth. Stewart even produced several exemplars of her true signature from other official documents in support of her claim that the signature on Government's Exhibit 1 was not hers. Neither Gershman nor

---

9. Indeed, it appears that the Florida Bar has made some progress on this issue in recent years. As late as January 2010, the rule on candor toward the tribunal expressly prohibited a lawyer from "permit[ting] any witness, *including a criminal defendant,* to offer testimony or other evidence that the lawyer knows to be false." (emphasis added). But at the same time the Bar removed rule's express reference to criminal defendants, it also removed the accompanying comment discussing the difficulties faced by a criminal defense

lawyer with a potentially untruthful client. *See In re Amendments to the Rules Regulating the Fla. Bar,* 24 So.3d 63, 124–27 (Fla.2009).

10. *Compare* Fla. Bar. R. 4.3–3(a)(4) ("A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.") *with* Model R. Prof'l Conduct 3.3(a)(4) (2002) ("A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.")

Cleary had any objective proof that Stewart was lying, and so possessed no actual knowledge of the same. Accordingly, under Rule 4.3–3, they had no obligation to inform the tribunal.

It is true that Gershman and Cleary both suspected Stewart was lying. But assuming without deciding that this suspicion rose to the level of "reasonable belief contemplated by Rule 4–3.3, the Rule permitted, but did not require, Gershman and Cleary to share their concerns with the court. *See also* Fla. Bar R. 4.3.3(a) cmt. ("The prohibition against offering false evidence only applies if the lawyer knows that the evidence is false. A lawyer's reasonable belief that evidence is false does not preclude its presentation to the trier of fact"). In sum, under these circumstances, Gershman and Cleary were not required to inform the court of their mere suspicion.[11] They complied with their professional and ethical responsibilities in this regard.

**B. Whether Robert Gershman, Esq., and John Cleary, Esq., fulfilled their professional and ethical obligations to properly inform the Court that their client had given perjurious testimony at the Motion To Suppress and/or the trial of the above-styled cause as soon as they became aware of same.**

Even if a lawyer does not know that his client is going to perjure herself before the client does so, he must bring it to the Court's attention if he learns of it later. In other words, even if Gershman and Cleary did not know that Stewart was planning to lie about Government's Exhibit

1 before her testimony at either the suppression hearing or the trial, if they subsequently learned of its falsity, they were required to bring that fact to the Court's attention. But in order for this obligation to arise, they must have had actual knowledge of the false nature of the testimony.

As established at the evidentiary hearing, to this day, Gershman and Cleary do not possess any conclusive evidence that Stewart was not telling the truth. It is undisputed that Gershman and Cleary suspect that Stewart lied on the stand. But under these circumstances, neither attorney has *actual* knowledge that Stewart committed perjury.[12] That is what is required under the Rule. Accordingly, since Gershman and Cleary had no obligation to inform the Court of their suspicions about their client's testimony even after she testified, they fulfilled their professional and ethical obligations in this regard.

**C. Whether John Cleary, Esq. fulfilled his professional and ethical obligations in giving a closing argument that relied on testimony he knew to be perjurious.**

It is axiomatic that a lawyer may not knowingly present false evidence to the Court. Here again, however, even assuming Stewart's testimony about Government's Exhibit 1 was false, Cleary's closing argument did not make any mention of that testimony. In fact, Cleary so deliberately avoided discussion of that topic that the first thing the prosecutor did in his rebuttal argument was comment on the fact that Cleary had not brought up Stew-

11. Gershman offered Stewart's testimony in the narrative in an abundance of caution because he did not believe her testimony and was concerned about misleading the Court. That may or may not have been the most appropriate way to handle the situation with regard to his responsibilities to Stewart, but it does not constitute a violation of the duty of candor because Gershman did not have actual knowledge that Stewart's testimony was false.

12. In fact, Stewart has never wavered in her contention that she gave truthful testimony at both the suppression hearing and the trial.

art's contentions about the inauthenticity of the currency reporting form. Moreover, as discussed above, at no time did Cleary know Stewart's testimony to be perjurious. For these reasons, Cleary did not violate his professional and ethical obligations in delivering a closing argument on behalf of his client.

## VI. *Conclusion*

For the foregoing reasons, the Court finds that Robert Gershman, Esq. and John Cleary, Esq. fulfilled their ethical and professional responsibilities with regard to the specific inquiries posed by the Order of Referral [DE 55].

**DONE AND SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 15th day of February, 2013.