IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| Thor D. Perry, | : |
| | : |
| Appellant | : |
| | : |
| v. | : No. 1923 C.D. 2016 |
| | : Argued: May 1, 2017 |
| Erie County, Warden James | : |
| Veshecco, Jason H. Worcester, | : |
| and Clifford J. Palmer | : |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge


OPINION
BY JUDGE WOJCIK                                   FILED:  August 25, 2017


        Thor D. Perry appeals from the order of the Court of Common Pleas of Erie County (trial court) granting the summary judgment motion of Erie County (County) and Warden James Veshecco (Warden).  We affirm.

        In January 2012, Perry was incarcerated in the Erie County Prison (Prison) following charges that he had assaulted his former girlfriend. Unbeknownst to Perry, his former girlfriend's uncle, Jason Worcester, worked at the Prison as a corrections officer at that time.

        On January 28, 2012, Perry was severely beaten by other inmates. Worcester and another corrections officer, Clifford Palmer, were present in Perry's housing pod in the Prison and had arranged for the inmates to commit the assault. Worcester and Palmer were fired and ultimately convicted of criminal charges arising out of the assault.

On January 15, 2014, Perry filed a civil complaint alleging, in relevant part, that the County and the Warden violated his constitutional rights under the Eighth and Fourteenth Amendments[1] to the United States Constitution and sought relief under 42 U.S.C. §1983 (Section 1983).[2] Perry's complaint asserted that the Warden was responsible for the violations because he failed to establish or enforce any policy, practice, or custom that might have prevented or stopped the assault. Perry claimed that the County was also responsible for the violations by and through the actions or inactions of the Warden and its general administration of the Prison.

Specifically, Perry's second amended complaint asserted a direct causal link between the Prison's policies and customs and his assault, identifying six specific practices. First, Perry argued that Prison policy limiting when and who

---

[1] In his complaint, Perry argued that his rights under the First, Fourth, Eighth, and Fourteenth Amendments were violated, however we agree with the trial court that, based on Perry's factual pleadings in reference to the County and the Warden, he only implicates a violation of his Eighth Amendment right to be free of cruel and unusual punishment and his Fourteenth Amendment right to due process, protecting him from physical attack.

[2] Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

There are two essential elements of a Section 1983 action: (1) whether the conduct in question was committed by a person acting under the color of state law; and (2) whether the conduct deprived the person of rights, privileges, or immunities guaranteed by the Constitution or laws of the United States. *Wareham v. Jeffes*, 564 A.2d 1314, 1322 (Pa. Cmwlth. 1989).

may terminate an officer offered no effective means to terminate Worcester before he became a danger to Perry. Second, Perry argued that sergeants and corporals acting as the officer in charge (OIC) on weekends provided ineffective supervision for the other union officers. Third, Perry asserted that the policy of self-reporting pre-existing relationships with inmates was ineffective in preventing conflicts of interest. Fourth, Perry argued that there was no effective policy or practice to prevent officers from gaining unauthorized access to areas of the Prison to which they were not assigned. Fifth, Perry asserted that the Prison had no policy, procedure, or practice that would allow inmates to identify the OIC on weekends. Finally, Perry argued that the Prison had a persistent, unaddressed problem of understaffing that meant no other corrections officers were in the vicinity at the time of the assault on Perry. On August 17, 2015, following discovery, the County and the Warden filed a Motion for Summary Judgment and the matter was argued before the trial court on January 4, 2016.

In disposing of the motion, the trial court initially found that Worcester had started his employment at the Prison in 2008 where he was required to complete a probationary period. At the time, only the Warden could terminate a probationary employee. The Warden intended to dismiss Worcester prior to the end of his probationary period, however, a family emergency required the Warden to be absent when Worcester's probationary period ended. Upon his return, the Warden attempted to terminate Worcester but a labor arbitrator determined that the grounds for termination were insufficient. In the subsequent years, nothing in Worcester's job performance, until the incident in question, merited termination. Trial Court's Findings of Fact (F.F.) at C, JJ-NN.

The trial court concluded that the limitation on who could terminate a probationary employee was not constitutionally defective in the context of a Section 1983 claim. The trial court noted that the Warden testified that he tried to have Worcester terminated as a result of his laziness and unreliability, not his propensity for violence or criminal behavior. Notes of Testimony (N.T.) at 55-57. The trial court determined that there was nothing in the record to point to either the County's or the Warden's awareness that its policy regarding probationary terminations would create a possibility that a prisoner's constitutional rights would be violated. Thus, the trial court concluded that there was insufficient proof for a jury to find deliberate indifference to Perry's rights on the part of the County or the Warden as a result of this policy.

The trial court next found that the assault on Perry occurred on a weekend night when a sergeant, assisted by a corporal, was the OIC. Captains normally served as the OIC of the Prison. Sergeants were designated as unit managers and were responsible for ensuring that the unit operated properly. Corporals assumed the roles of sergeants in their absence. In accordance with a long-standing practice at the Prison to facilitate time off for captains, the OIC on weekends was usually a sergeant or a corporal. The Prison had no particular uniform or insignia designating the OIC. The Warden had no indication of a greater propensity for incidents of misconduct during weekends when a sergeant was the OIC. F.F. at H, I-L, N, V-W, GG.

The court found that supervision duties and responsibilities at the Prison were generally the same for sergeants, corporals, and captains. Sergeants and corporals directly supervised the training and performance of corrections officers. They were responsible for ensuring that all employees carried out their

4

duties in accordance with the standards, policies, and procedures of the Prison, including maintaining a safe working environment for both staff and inmates. Sergeants and corporals reported directly to captains and the Deputy Warden for Security. F.F. at U, X-Z.

The court further found that the only significant difference that existed in terms of supervisory duties was that sergeants and corporals, because of their membership in the Prison's union, were not permitted to directly discipline or formulate performance evaluations of subordinate corrections officers. Instead, sergeants and corporals were responsible for reporting misconduct, as well as exceptional or deficient job performance, of a subordinate to a captain and providing any necessary counseling to fellow corrections officers. Only captains could issue written warnings but sergeants and corporals could recommend such action and provide input to captains in regards to performance evaluations. Through its investigation subsequent to the incident, the United States Department of Justice, National Institute of Corrections (NIC) concluded that the inability to make formal performance evaluations or initiate discipline did not impair the performance of sergeants or corporals to act as the OIC. F.F. at O-S, HH-II.

The trial court concluded that neither the County nor the Warden had any reason to believe that having a sergeant acting as the OIC increased the likelihood of the violation of inmates' constitutional rights. The trial court determined that there was no evidence of prior similar incidents occurring at any other time when sergeants or corporals were the OIC, let alone a pattern of incidents to implicate that the Prison's practice of not requiring a captain to be the OIC was a direct cause of Perry's assault. The trial court noted that Perry offered no evidence outside of bald speculation that a captain acting as the OIC could or

5

would have done anything differently in terms of supervising Worcester and Palmer that would have prevented or stopped the assault. As a result, the trial court concluded that there was no factual dispute for a jury to decide in this regard.

The trial court also determined that the lack of uniform insignia designating the OIC for each shift was irrelevant in preventing or mitigating the assault on Perry. The trial court explained that the record demonstrated that the OIC on duty, whether sergeant, captain, or corporal, is not regularly present in the housing pods and thus would not be consistently available to the inmates, even if the OIC wore a special uniform insignia. The court concluded that there was insufficient proof for a jury to find that this policy was causally linked to Perry's assault or executed by the Warden or the County in such a way as to permit a reasonable jury to find deliberate indifference.

The court found that on the night of Perry's assault, Worcester was not assigned to work on Perry's housing pod and was not authorized to be there. According to Prison policy, a corrections officer was not allowed to leave his duty station without permission and was forbidden from entering areas of the Prison to which he was not assigned. The officer assigned to the housing pod had discretion to open the inner door and allow entrance to another corrections officer. Prison policy also required all corrections officers to disclose any relationship they have with an inmate to their supervisor when the officer became aware of the conflict of interest. The trial court found that the exact circumstances for how Worcester gained access to Perry's housing pod were neither set forth in the summary judgment record nor enumerated in Perry's Memorandum in Opposition to the Motion for Summary Judgment. F.F. at G, AA-DD, OO.

6

The trial court reiterated that the Prison's policy expressly forbids corrections officers from entering areas of the Prison to which they are not assigned. The trial court disagreed with Perry's assertion that Worcester had "unfettered" access to all areas of the Prison for all purposes. Instead, it highlighted that in order for Worcester to gain access to Perry's housing pod, it is likely that Palmer opened the secured entrance, in violation of proper procedure. The trial court noted that Perry offered no evidence to support his claim that a defect in the policy was causally linked to his assault and that, in fact, the record was silent to any historical problems with the execution of the policy that would have reasonably indicated deliberate indifference on the part of the Warden or the County. Therefore, the trial court concluded that the Prison's policy regarding officers' movements created no genuine issue of material fact with regard to the violation of Perry's rights.

The trial court found that Perry failed to identify the manner in which the OIC failed to prevent Perry's assault. Furthermore, the trial court found that Perry failed to present any evidence indicating that the Warden either participated in or was aware of Worcester's intention to direct or facilitate the assault on Perry.

The trial court emphasized that the Warden had concerns about staffing levels and would have preferred more corrections officers on duty. However, the trial court noted that there was no evidence that the Warden had any control over the resources available and necessary to do so. The trial court determined that Perry presented no evidence that greater staffing numbers would have prevented or stopped his assault. The trial court concluded that any link between understaffing at the Prison and Perry's assault was too tenuous to put before a jury as a genuine issue of material fact.

7

The trial court ultimately concluded that the record, when viewed in the light most favorable to Perry, contained no genuine issues of material fact to establish that Perry was incarcerated under conditions that posed a substantial risk of serious harm, that the adoption or execution of policies, practices, or customs of the Prison were causally linked to the assault, or that the Warden acted with deliberate indifference towards the violation of Perry's constitutional rights. On appeal to this Court,[3] Perry argues that the trial court erred in granting the summary judgment motion of the County and the Warden.

However, initially, the County and the Warden argue that the instant appeal should be quashed. They assert that the trial court's order granting summary judgment is not a final, appealable order because the case remains pending against two other defendants, Worcester and Palmer. On February 19, 2016, Perry filed in the trial court both his Motion for Determination of Finality Pursuant to Pa. R.A.P. 341(c)[4] with respect to the trial court's order granting summary judgment in favor of the County and the Warden, and his Notice of Appeal of that order. On March 3, 2016, the trial court granted Perry's motion

---

[3] This Court may only disturb a decision granting summary judgment if the trial court committed an error of law or abused its discretion. *Wimer v. Pennsylvania Employees Benefit Trust Fund*, 939 A.2d 843, 850 (Pa. 2007).

[4] Pa. R.A.P. 341(c) states, in pertinent part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim or when multiple parties are involved, the trial court or other government unit may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case. Such an order becomes appealable when entered.

8

regarding the order's finality, finding that an immediate appeal of its order granting summary judgment would facilitate the resolution of the entire case. In this appeal, the County and the Warden argue that Perry's appeal was taken before the trial court certified its order under Rule 341(c) and, as a result, this Court lacks jurisdiction to consider the appeal.

However, Pa. R.A.P. 905(a)(5) provides that "[a] notice of appeal filed after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Pa. R.A.P. 905(a)(5) applies to situations where, as here, "an appeal is prematurely filed from an interlocutory order and the appeal is subsequently perfected when a final, appealable order is entered." *Raheem v. University of the Arts*, 872 A.2d 1232, 1236 (Pa. Super. 2005). Pa. R.A.P. 905(a) does not abrogate the requirements of finality; the Rule acts to perfect a premature appeal "where an appeal is filed after a trial court makes a final determination, but before the official act of entering judgment has been performed." *Pennsylvania Orthopaedic Society v. Independence Blue Cross*, 885 A.2d 542, 546 (Pa. Super. 2005). Although an order granting summary judgment that does not dispose of all claims and all parties would be considered to be an interlocutory order and not appealable, we disagree with the County and the Warden's contention that Pa. R.A.P. 905(a) is solely limited to appeals filed prior to the entry of judgment on the docket.

Rather, Pa. R.A.P. 905(a)(5) has been applied in a variety of procedural contexts. *See, e.g., In re N.W.*, 6 A.3d 1020, 1021 n.1 (Pa. Super. 2010) (holding that although a juvenile improperly filed an appeal from an interlocutory order of adjudication, appellate jurisdiction was perfected upon the entry of a final order of disposition); *Appeal of Gannon*, 631 A.2d 176, 181 (Pa. Super. 1993)

9

(holding that premature appeals filed after the confirmation of account of an estate by the auditing court were perfected by the absolute confirmation of the final account by the orphans' court *en banc*); *In re J.W.*, 578 A.2d 952, 955-56 (Pa. Super. 1990) (Superior Court entered an order directing a mother to perfect its appellate jurisdiction by filing a praecipe for the entry of a final decree in her appeal filed from an order dismissing her exceptions to a decree *nisi* terminating her parental rights); *Commonwealth v. Hamaker*, 541 A.2d 1141, 1142 n.4 (Pa. Super. 1988) (explaining that although the motorist prematurely filed his appeal from the trial court's denial of his post-trial motions, appellate jurisdiction was perfected upon the imposition of the judgment of sentence). We conclude that this Court's appellate jurisdiction was perfected upon the trial court's certification of its order granting summary judgment under Rule 341(c) and, therefore, decline to quash this appeal.

On the merits, we note that it is only appropriate for a trial court to grant summary judgment where there is no genuine dispute of material fact. Pa. R.C.P. No. 1035.2(1). "In considering the merits of a summary judgment motion, a court must view the evidence of record in the light most favorable to the non-moving party, and resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party." *Wimer v. Pennsylvania Employees Benefit Trust Fund*, 939 A.2d 843, 850 (Pa. 2007). A genuine issue of material fact only exists if a reasonable jury could find in favor of the non-moving party on that issue, but the non-movant must point to specific facts of record to demonstrate a genuine dispute requiring resolution at trial. *Chavarriaga v. New Jersey Department of Corrections*, 806 F.3d 210, 218 (3d Cir. 2015).

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690-91 (1978), the United States Supreme Court held that municipal governments, and local officials sued in their official capacity, are "persons" for purposes of Section 1983 claims and can be sued directly where the alleged unconstitutional actions implement or execute "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," including informal customs. However, "a local government may not be sued under [Section] 1983 for an injury inflicted solely by its employees or agents," thereby excluding liability on a *respondeat superior* theory. *Id.* at 694. Liability will be imposed when the local government implements an official policy that is either unconstitutional on its face or is the "moving force" behind the constitutional tort of its employees. *Id.*; *see also Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

The court must also "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). For purposes of alleged Eighth Amendment violations, it is not necessary for the claimant to prove an intent to deprive him of his constitutional rights where he can show that circumstances manifested a deliberate indifference to the deprivation of those rights. Instead, the United States Supreme Court established a subjective test for deliberate indifference holding that:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

11

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). However, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause of commendation, cannot … be condemned as the infliction of punishment." *Id.* at 838. For purposes of alleged violations of the Due Process Clause of the Fourteenth Amendment, a claimant is required to show deliberate decisions of government officials to deprive a person of life, liberty, or property, not merely lack of due care. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). In other words, in order to succeed in his Section 1983 action, it was incumbent upon Perry to demonstrate that intentional acts or omissions by the Warden and the County in regards to the establishment or enactment of official policies, practices, or customs were the direct and proximate cause of the violations that he alleged.

Perry relies on two recent decisions from the United States District Court to support his argument. However, he mischaracterizes each case as holding that merely because the Department of Justice (DOJ) was called in to evaluate policies and procedures following incidents that resulted in Section 1983 actions, the DOJ's recommendations were, on their face, sufficient for a reasonable jury to find causation and deliberate indifference on the part of municipal defendants.

In both cases, *Berry v. City of Philadelphia*, 188 F.Supp. 3d 464 (E.D. Pa. 2016), and *Coyett v. City of Philadelphia*, 150 F.Supp. 3d 479 (E.D. Pa. 2015), a Section 1983 claim was filed against the City of Philadelphia and Philadelphia Police Department (PPD) officers alleging the use of excessive force arising from officer-involved shootings. In both cases, the defendants filed a motion for summary judgment. Both incidents occurred during a period of increased officer-involved shootings within the PPD, which prompted the PPD Commissioner to request technical assistance from the DOJ. The DOJ examined the PPD's deadly

12

force policies and practices and issued a report, which found numerous inadequacies in the policies and practices related to training PPD officers in the use of force. Though the court in each case determined that summary judgment was inappropriate, its reasoning was not based solely, as Perry asserts, on the mere fact that the PPD requested that the DOJ evaluate its use of force policies. Instead, the trial court in each case concluded that a reasonable jury could find deliberate indifference based on the *results* of the DOJ investigation coupled with a well-documented pattern of officer-involved shootings that the PPD Commissioner readily acknowledged. *Berry*, 188 F.Supp. 3d at 475; *Coyett*, 150 F.Supp. 3d at 486-89.

Here, while the County requested that the NIC review its policies and procedures following Perry's assault, the request was made to address overall issues of misconduct including timecard fraud, stolen ammunition, and public drunkenness, in addition to the misconduct that led to Perry's assault. NIC Technical Assistance Report (NIC Report) at 2. The NIC did identify deficiencies and make recommendations. However, none of the identified deficiencies corroborate Perry's assertions that the policies he identified were the moving force behind any of the misconduct that occurred at the Prison. The NIC Report did not identify any issues with the policy regarding officer termination and, in fact, commended the "swift action of the County to terminate employees who had committed serious violations of Prison and County personnel rules." NIC Report at 5. The NIC Report did not identify any issues with the policy regarding reporting conflicts of interest. The NIC Report did not identify any issue with the policy proscribing officers from entering unassigned areas of the Prison without authorization, or the enforcement thereof. The NIC Report found no issue with the

13

lack of uniform insignia designating the OIC. The NIC Report found that the Prison met its minimum staffing requirement. NIC Report at 4-11.

The NIC's conclusions and recommendations focused almost exclusively on clarifying and streamlining supervision and staffing as a means of improving officer morale, recruitment efforts, and increasing diversity in the higher ranks. Though the NIC recommended evaluating the role of sergeants and corporals as first level supervisors, as noted above, its report did not find that sergeants and corporals serving in supervisory roles increased incidents of misconduct. The NIC's recommendations regarding staffing issues concentrated on simplifying the hiring and promotion processes and broadening the candidate pools in order to reduce the workload of individual corrections officers, not to reduce incidents of misconduct. NIC Report at 12-13.

The record outside the NIC Report likewise fails to demonstrate any obvious ties between the policies and Perry's assault. While Worcester's firing after his probationary period would have ultimately averted Perry's assault, the reason for his attempted firing was entirely unrelated to violence, and neither the Warden nor the County had reason to believe that Worcester would facilitate such an attack. There is no evidence that a captain on duty as OIC would have prevented the assault. There is no evidence that Perry's knowledge of who the OIC on duty was would have prevented the assault. There is no evidence that the County or the Warden had the ability to resolve any problems of understaffing in a way that would have prevented Perry's assault.

Even with respect to those rules that Worcester and Palmer flagrantly violated – the Prison's conflict-of-interest policy and the policy requiring corrections officers to remain at their stations unless given permission to leave as

14

well as barring them from areas of the prison where they had no duties – there is no evidence in the record that either the Warden or the County knew that the result of breaking these rules would be Perry's assault.

On review, we agree with the trial court that Perry has failed to demonstrate a causal link between the Prison's implicated policies, practices, and customs and his assault. There is no indication that the Warden or the County actually knew that any of the implicated policies might have created circumstances under which an inmate's constitutional rights would likely be violated. Additionally, there is nothing demonstrating that the Warden or the County made deliberate decisions to deprive Perry of his rights. Despite his assertion that there was a "perfect storm" of policy deficiencies that led to his assault, Perry points to no specific facts that would allow a reasonable jury to conclude that the policies, taken separately or together, were direct causes of Perry's assault.

Accordingly, the trial court's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thor D. Perry,                              :
                                            :
                              Appellant     :
                                            :
              v.                            : No. 1923 C.D. 2016
                                            :
Erie County, Warden James                   :
Veshecco, Jason H. Worcester,               :
and Clifford J. Palmer                      :

# **O R D E R**

AND NOW, this 25th day of August, 2017, the order of the Court of
Common Pleas of Erie County, entered February 10, 2016, is AFFIRMED.


                                   _____
                                   MICHAEL H. WOJCIK, Judge